# Exhibit 1

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is made this 1st day of November, 2018 (the "Effective Date"), between Thomas Santoni ("Executive"), an individual, and The State Group Industrial (USA) Limited, a Delaware corporation (the "Company"), collectively (the "Parties") and supersedes all other agreements, representations or understandings between the Parties or their Affiliates.

**Whereas,** Executive shall be eligible to participate in The State Group Holding Partners LP's ("Holdings") management incentive plan or program ("Incentive Plan") and have the right to make co-investment in the equity of Holdings or an Affiliate; however, the rights and obligations of such participation in the Incentive Plan and co-investment shall be governed by the terms of the Incentive Plan, co-investment documents, award or grant agreements, and Holding's Limited Partnership Agreement (or as applicable Affiliate's Limited Partnership Agreement), as may be amended or restated, and Executive agrees not to rely on any representations regarding potential valuation or similar matters, other than what may be contained in the terms of the Incentive Plan, co-investment documents, award or grant agreements, and Holding's (or as applicable Affiliate's) Limited Partnership Agreement;

In consideration of the mutual promises expressed herein, Executive and the Company have agreed to the terms of this Employment Agreement as follows:

1. Employment.

(a) Effective Date and Term. This Agreement shall be effective as of the Effective Date and will continue indefinitely thereafter unless Executive's employment is terminated earlier in accordance with Section 3 below.

(b) Duties. Executive will serve on the Board of Directors of the Company, and shall in his position as Chief Executive Officer ("CEO") of the Company report to the Board of Managers of The State Group Holdings GP LLC (the "Board"). Executive agrees that his position as CEO of the Company and for such other Affiliates (as defined below) of the Company to which Executive may be assigned by the Board, shall be his full-time employment, and that he will devote all of his business time, attention and skills to the successful operation of the Company and its Affiliates and/or its subsidiaries, and that he will perform such duties, functions, responsibilities and authority normally associated with that of an executive in a company the size and nature of the Company, as well as such duties that are from time to time delegated to Executive by the Board to the best of his abilities, with the highest degree of fiduciary loyalty and care to the Company and its Affiliates. Executive further agrees to conduct himself professionally, consistent with the highest standards of decorum and judgment, adhere to the Company's operating procedures and policies for its leadership team, and develop and maintain good relations with other members of the Company's management, staff, and Board. For the duration of his employment, Executive agrees that, other

1

than those activities approved by the Board in writing, he shall not engage in any other business activity, and that all business opportunities which might be served by the Company or any of its Affiliates will be brought exclusively to the attention of the Company. The provisions of this Section 1(b) shall not prohibit Executive from (i) making investments in entities the equity of which is traded on a regulated stock exchange, but only to the extent Executive owns no more than three (3) percent of the outstanding stock thereof, or (ii) devoting reasonable time and energies to charitable and civic activities; provided such activities described in clauses (i)-(ii) above do not, individually or in the aggregate, interfere in any material respect with the performance of Executive' duties hereunder.

(c)     Location of Performance of Duties. Executive shall have as his primary office, the Company's corporate office, but shall be expected to perform his duties in all locations where the Company and its Affiliate's locations may currently exist or be established in the future. Executive shall be provided corporate housing for a period as determined at the discretion of the Board.

(d)     Compliance. Executive agrees to abide by all policies, ethics standards, codes of conduct, and procedures of the Company and its Affiliates (as defined below) as such policies and procedures may exist, be amended or be adopted in the future.

(e)     Definition of Affiliate. For purposes hereof, "Affiliate" means, when used with referenced to a specified person, any "person" as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), that, directly or indirectly, controls, is controlled by, or is under common control with the specified Person. For this purpose, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise.

2.     Compensation and Benefits.

(a)     Base Salary. Executive's salary shall be $350,000 per year, less applicable taxes and withholdings, to be paid on a bi-weekly basis of $13,461.54 in accordance with the Company's regular payroll practices for similarly situated executives.[1] Executive's salary is subject to periodic review and evaluation by the Board. The base salary in effect hereunder shall be referred to herein as the "Base Salary."

(b)     Bonus. Executive will be eligible for an annual target bonus of $250,000 ("Target Bonus"), which shall be based on the achievement of objective performance metrics to include the performance of the Executive, Company and its Affiliates as established annually by the Board after consultation with Executive and to encompass both financial and non-financial objectives. Executive's entitlement to the bonus under this Section 2(b), and the amount of such bonus shall

---

[1] All references in the Agreement to dollars refer to United States Dollars (USD).

2

be determined by the Board in its good faith discretion; provided, however, if the terms of a written annual incentive bonus plan do not include provisions regarding the time of payment for an annual incentive bonus, payment of any such bonus shall occur within fifteen (15) days of the completion the Company's internal reported financials for the fiscal year to which the bonus relates, but in any event by January 31 of the year following the performance year. Bonuses are not earned until paid, and Executive must be employed by the Company and not have provided notice of termination of his employment at the time of payout in order to have earned and be entitled to payment of a bonus.

(c) Benefits.

(i) Employee Benefits. Executive shall be eligible for all employee benefits extended, from time to time, to all full-time employees of the Company in positions similar to Executive, subject to the terms and conditions of the Company's policies and employee benefit plans, as those policies and plans are amended or terminated from time to time. Executive acknowledges that he shall have no vested rights under or in respect to participation in any such plan or program except as expressly provided under the terms thereof.

(ii) Business Expenses. Executive shall be authorized to incur reasonable expenses for completion of his duties with the Company, including expenses for entertainment, travel, and similar items, in accordance with the terms and conditions of the Company's expense reimbursement policy as in effect from time to time. For the avoidance of doubt, reimbursable travel expenses will include travel to and from Executive's residence in connection with the performance of his duties herein.

(iii) Vacations. Executive shall be entitled to four (4) week annual vacation pursuant to the Company's established vacation policy for executive officers, subject to the terms and conditions thereof; provided however, that unused vacation may not be carried over to the following year, and if not used by the end of the calendar year will lapse.

(d) Reimbursement of Attorney's Fees. Company shall reimburse Executive for out of pocket legal fees and expenses incurred by Executive, not to exceed $5,000 in the aggregate, incurred by Executive in the review and finalization of this Agreement.

(e) Reimbursement for Compliance with Tax Obligations.

(i) Income Taxes. Company shall reimburse Executive for the excess, if any, of (A) the income taxes (Federal, state, local, and foreign) Executive actually pays with respect to his compensation from Company as a result of Executive's conducting business operations outside the United States, over (B) the income taxes (Federal, state, and local) on Executive's compensation from Company that Executive would have paid had his principal place of employment remained in the United States, such that the net effect of the reimbursement (after adjusting for any additional taxes due with respect to the reimbursement) shall be that Executive receives substantially the same

3

after-income tax compensation as Executive would have received if Executive's employment remained in the United States. The amount set forth in Section 2(e)(i)(B) shall be evidenced by the written opinion of a certified personal accountant ("CPA"), which CPA may be selected by Executive, and will be based upon the same deductions, itemizations, and exemptions, as applicable, used by Executive in calculating Executive's actual tax liability.

        (ii)    <u>Accounting Expenses</u>. Company shall reimburse Executive for the reasonable costs Executive incurs in connection with compliance with the Foreign Account Tax Compliance Act ("FATCA") and the reasonable costs Executive incurs in calculating his taxes and filing his tax return, including the costs associated with calculating the amounts set forth in Section 2(e)(i) above.

        (f)    <u>Section 409A Compliance</u>. Any expense reimbursements to Executive shall be made in compliance with Section 409A of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations issued thereunder ("Section 409A"). In accordance with Treasury Regulation Section 1.409A-3(i)(1)(iv), any reimbursements or in-kind benefits under the Agreement will be provided only during the term of Executive's employment and are not subject to liquidation or exchange for another benefit. In no event may requests for reimbursement be submitted by Executive later than 90 days following the date on which the expense is incurred, and Company will reimburse expenses no later than 30 days after submission. The amount of expenses eligible for reimbursement, or in-kind benefits provided, during any calendar year may not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year.

        3.    <u>Employment At-Will</u>.

        (a)    <u>Termination of Employment</u>. Executive is an at-will employee and either party to this Agreement may terminate the employment relationship at any time, for any reason, with fifteen (15) days written notice, unless otherwise provided herein. If Executive provides notice of his intention to terminate his employment, regardless of the reason, the Company in its discretion may accelerate Executive's resignation and deem such resignation to be effective immediately (which shall then be deemed the Termination Date), subject only to the obligations, if any, under Section 3(a)(i) below, and such acceleration shall not constitute termination of Executive's employment by the Company for any purpose. If the Company terminates Executive's employment for Cause (as defined below), it may do so immediately (which shall then be deemed the Termination Date), subject only to the obligations, if any, under Section 3(b) below. Executive's employment shall immediately terminate upon Executive's death. In the event Executive's employment is terminated because of Disability (as defined below), the Termination Date shall be as specified in Section 3(i) below. If Executive's employment is terminated by the Company without "Cause" (as defined below) or by the Executive for Good Reason (as defined below), then:

        (i)    the Company shall pay to Executive an amount equal to twelve (12) months of Executive's then effective Base Salary in accordance with the terms and conditions provided in

Section 3(e) of this Agreement, and also provide COBRA continuation coverage for Executive and his family under the Company's medical plan for twelve (12) months, in accordance with applicable law at the Company's sole expense, provided that the Executive is not, and does not become eligible for another group health plan, and that such payments do not adversely impact the Company's health plans under IRS or DOL regulations, and provided further that Executive shall first deliver an executed Severance Agreement and General Release to the Company in the form attached as Attachment A and shall not revoke the Severance Agreement and General Release in accordance with its terms; (collectively the Company's payment of Base Salary and COBRA, as applicable, under this Section, constitutes "Severance Pay");

(ii)     the Company shall be obligated to pay Executive his Base Salary, reimbursable expenses and benefits owing to Executive through the Termination Date. In addition, any vested retirement benefits of Executive shall be payable in accordance with such plans;

(iii)     the Company shall be released from any and all further obligations under this Agreement subject to the provisions of Section 14 herein concerning Arbitration of disputes; and

(b)     Cause. In the event Executive's employment is terminated for Cause, the Company shall be released from any and all further obligations under this Agreement subject to the provisions of Section 13 herein concerning Arbitration of disputes, except the Company shall be obligated to pay Executive his Base Salary, reimbursable expenses and benefits owing to Executive through the Termination Date (any vested retirement benefits of Executive shall be payable in accordance with such plans). Termination by the Company for "Cause" shall mean (i) Executive's conviction by a court (or plea of guilty, no contest, deferred adjudication or probation) of, to, or for a felony, or any crime involving theft, fraud, dishonesty, embezzlement, or any other crime which involves immoral conduct or actions likely to harm the reputation of the Company, whether or not committed in the course of performing services for the Company; (ii) Executive's breach of any fiduciary duty to the Company, including breach of the leadership team's operating procedures and policies established or adopted by the Company; (iii) material act(s) or omission(s) taken by Executive in connection with his employment which are dishonest or fraudulent; (iv) the commission by Executive of any material actions in violation of the written rules, policies, ethical standards or codes of conduct of the Company or Affiliates, (v) conduct by Executive that is insubordinate or involves repeated absenteeism, (vi) Executive's performance of his duties hereunder which is deemed to be unsatisfactory job performance either in the manner of fulfillment of such duties or the results achieved, but only after written warning to Executive advising his of the deficiencies in job performance and/or objectives and describing the improvement needed; (vii) conduct by Executive giving rise to a claim by another employee of unlawful harassment or discrimination, which claim, after a complete and diligent investigation, would lead a reasonable person to conclude that Executive has violated state or federal discrimination laws, in a manner which would reasonably and customarily require the discharge of an executive employee; (viii) conduct by Executive, or Executive's failure to act giving rise to Legitimate Claims by any persons that the Company or any

5

TS

of its subsidiaries is in violation of any federal, state or local civil or criminal statute or act (the term "Legitimate Claims" shall mean conduct by the Executive, or Executive's failure to act, undertaken in dereliction of his duties, gross negligence or without a good-faith belief in the lawfulness of such action resulting in any claims, allegations or assertions which, in the reasonable opinion of the Company (after a diligent investigation of the facts), have substantial merit and which would reasonably and customarily require the discharge of an executive employee; (ix) Executive's disregard of the lawful and reasonable directives of the Board communicated to Executive; (x) Executive's failure to maintain the privacy of Confidential Information of the Company or Affiliates except for such disclosure in connection with the good faith performance of Executive's duties or as may be required by subpoena or in connection with any allegation of wrongdoing; (xi) a breach by Executive of any covenant or agreement between Executive and the Company set forth in Sections 4 and 5 hereof; or (xii) the Company is temporarily or permanently enjoined from employing Executive, or a court otherwise orders the Company to cease employing Executive, or the Company determines in its reasonable discretion that it is in the best interests of the Company and/or its employees, officers or directors that Executive's employment with the Company be terminated due to restrictions or covenants to which Executive agreed with a prior entity which is likely to impact Executive's ability to timely perform his duties herein on behalf of the Company. Provided, however, that the Company shall not terminate the employment of the Executive as a result of the alleged events described in clauses (iv) or (vi) above unless the Company provides the Executive written notice and the Executive thereafter fails to cure such event (if in the reasonable determination of the Company such matters are curable), within thirty (30) days after receipt of such notice.

(c)     Termination by Executive for Good Reason.  Executive shall have the right to terminate his employment for Good Reason by providing thirty (30) days' written notice of the event which he contends constitutes Good Reason and specifing such events to the Company in order to provide the Company the opportunity to cure the alleged Good Reason claimed by the Executive and provided the Company does not cure the Good Reason within such thirty (30) days. "Good Reason" shall mean:  (i) a material breach of this Agreement by the Company; or (ii) a material and adverse change in the Executive's duties and/or Base Salary. In the event of a termination under this provision, Executive shall be entitled to the benefits to which he otherwise would be entitled in a termination by Company without Cause; provided, however, that Company shall not be obligated to make any payment to Executive under this Section until Executive has delivered to Company a Severance Agreement and General Release in the form attached hereto as Attachment A.

(d)     Death or Disability.  In the event of Executive's death or Disability (as defined below), the Company shall be released from any and all further obligations under this Agreement, except that the Company shall be obligated to pay Executive or his estate his Base Salary, pro-rated Bonus, reimbursable expenses and benefits owing to Executive through the day on which Executive is terminated.

6

TS

(e)     Change of Control.     In the event Executive's employment (i) is terminated by the Company, or the acquiring entity for a reason other than for Cause during the sixty (60) day period after a Change in Control (as defined below), (ii) Executive's employment is terminated during the sixty (60) day period prior to a Change in Control by the Company for a reason other than for Cause and the termination was at the request of a third party or otherwise arose in anticipation of such Change in Control; or (iii) if the acquiring entity following a Change of Control does not offer Executive a position with comparable base salary, benefits, and responsibilities (a termination described in either clause (i), (ii), or (iii) in this Section 3(e), shall constitute a "Change of Control Termination"), then in such event, subject to Executive's execution of the Severance Agreement and General Release, after a change in control has occurred and payments due to, or received by, the Executive from the Company's Incentive Plan  are paid to Executive and are less than the amount of the Executive's then Base Salary, the Company will pay to Executive an amount of severance equal to the difference between the Incentive Plan and the Base Salary, less required state and federal withholdings.  By way of example, if the Base Salary at the time of a Change in Control Termination is $350,000 and payments received under the Incentive Plan are $250,000 then the Executive will receive severance of $100,000, less required withholdings, after expiration of the Revocation Period contained in the Severance Agreement and General Release.  A "Change in Control" means the consummation of a transaction, whether in a single transaction or in a series of related transactions that are consummated contemporaneously (or consummated pursuant to contemporaneous agreements), with a Person other than Blue Wolf Capital Partners, LLC ("Blue Wolf") or one or more Affiliates of Blue Wolf on an arm's-length basis pursuant to which such party or parties directly or indirectly (i) acquire (whether by merger, equity purchase, recapitalization, reorganization, redemption, issuance of Units or otherwise) more than 50% of the issued and outstanding shares of the Company or (ii) acquire assets constituting all or substantially all of the assets of the Company and its subsidiaries on a consolidated basis.  For the avoidance of doubt, the combination of the Company with one or more companies that are majority owned or controlled by Blue Wolf or its Affiliates, whether by merger or other corporate transaction, shall not constitute a "Change of Control" for purposes of this Agreement. Severance pay under this Section 3(e) is the sole payment Executive shall receive as a result of a Change of Control Termination.

(f)     Other Terminations.     In the event Executive's employment is terminated for any other reason, Executive shall only be entitled to receive Executive's Base Salary, reimbursable expenses and benefits owing to Executive through the Termination Date, and, provided further, any vested retirement benefits of Executive shall be payable in accordance with such plans (and in the event of Executive's death, such amounts shall be paid to Executive's estate).

(g)     Schedule of Severance Pay Benefits. The Severance Pay benefits applicable for a termination of Executive by Company without Cause in accordance with Section 3(a)(i), shall be based on the Termination Date, and: (i) paid over time in equal installments in accordance with the Company's payroll practices for its employees; and (ii) less applicable withholdings.  The first installment of the Severance Pay, unless delayed pursuant to Section 3(g), will be paid to Executive

7

in equal installments on the Company's first regular payday that follows expiration of the Revocation Period contained in the Severance Agreement and General Release executed by Executive, and will cover the period from the last day for which Executive was paid Base Salary through the payment date (and such schedule shall also be applicable to the Company's payment of COBRA continuation benefits as part of Executive's Severance Pay benefits).

(h)     409A. Notwithstanding anything to the contrary in this Agreement, the parties intend that any amounts payable hereunder comply with or are exempt from Section 409A. For purposes of Section 409A, each of the payments that may be made under this Agreement shall be deemed to be a separate payment for purposes of Section 409A. This Agreement shall be administered, interpreted and construed in a manner that does not result in the imposition of additional taxes, penalties or interest under Section 409A. The Company and Executive agree to negotiate in good faith to make amendments to the Agreement, as the parties mutually agree are necessary or desirable to avoid the imposition of taxes, penalties or interest under Section 409A. Notwithstanding anything else herein, to the extent any of the Severance Pay benefits are treated as nonqualified deferred compensation subject to Section 409A, then (i) no such payment shall be made to Executive unless Executive's termination of employment constitutes a "separation from service" with the Company (as such term is defined in Treasury Regulation Section 1.409A-l(h) and any successor provision thereto), and (ii) if Executive is determined by the Company to be a "specified employee" for purposes of Code § 409A(a)(2)(B)(i) and the Company determines that delayed commencement of any portion of the Severance Benefits is required in order to avoid a prohibited distribution under Code § 409A(a)(2)(B)(i), commencement of such portion of the Severance Pay benefits will be delayed for six (6) months following Executive's "separation from service" pursuant to Code § 409A, or, if sooner, until Executive's death. Delayed Severance Pay benefits (if any) shall be payable in a lump sum on the first business day following the expiration of such six (6) month period, and any remaining Severance Pay benefits due shall be paid as otherwise provided in Section 3(b)(i). Notwithstanding the foregoing, to the maximum extent permitted by applicable law, payment of the Severance Pay benefits shall be made in reliance upon Treasury Regulation § 1.409A-l(b)(9) (with respect to separation pay plans) or Treasury Regulation § 1.409A-l(b)(4). The Severance Pay benefits shall be treated as a right to a series of separate payments. If any payment subject to Section 409A is contingent on the delivery of a release by Executive and could occur in either of two years, the payment will occur in the later year. The provisions of this Agreement are intended to comply with the applicable requirements of Code § 409A and shall be limited, construed, and interpreted in accordance with such intent.

(i)     Non-Mitigation. Executive shall not be required to mitigate damages or the amount of any payment provided under this Agreement. Notwithstanding the foregoing, in the event Executive becomes employed by another person or company during the period in which Severance Pay benefits are due, or in the event Executive breaches any of the provisions in Sections 4 and 5 below, all further Severance Pay benefit amounts shall cease immediately and Executive shall forfeit the right to any such further payments.

8

(j)     Definition of Disability. For purposes of this Agreement "Disability" means in the opinion of a duly licensed physician selected by Executive and reasonably acceptable to the Company, Executive, because of physical or mental illness or incapacity, shall become substantially unable to perform the essential functions of his position, duties and services required of his under this Agreement with or without reasonable accommodation for a period of six (6) consecutive months. In such event, the Termination Date shall be the later of (A) the fifteenth (15) day after the Company has provided written notice to Executive of its intention to terminate Executive's employment, or (B) the date specified in such notice, provided that within the fifteenth (15) days after such notice by the Company, Executive has not returned to full time performance of his duties.

(k)     No Further Compensation. Neither Executive nor Executive's estate will be entitled to any other compensation upon termination of Executive's employment pursuant to this Agreement or otherwise.

4.     Prohibition Against Disclosure of Information and Restrictive Covenants.

(a)     Executive acknowledges that, by virtue of his employment, management and sensitive position with the Company, he will be in a confidential and fiduciary relationship with the Company, Holdings and their Affiliates, and will and has been provided, and has had and will continue to have access to Confidential Information and Trade Secrets (as defined by applicable federal and state laws, including but not limited to the Defend Trade Secrets Act of 2016) of the Company, Holdings and their Affiliates, including Blue Wolf (collectively the "Company Group"). In addition, Executive will receive specialized training in the course of performing his duties for the Company.  Executive acknowledges that the Confidential Information and Trade Secrets of the Company and Company Group have been developed or acquired by the Company Group through the expenditure of substantial time, effort, and money and they provide the Company with an advantage over competitors who do not know or use such information. Executive further acknowledges that the Company's business is conducted in a highly competitive market and use of Confidential Information and Trade Secrets of the Company and Company Group on behalf of a competitor would constitute unfair competition and adversely affect the business and goodwill of the Company and its Affiliates that Executive has been paid, in part, to develop for the benefit of the Company.  Executive additionally agrees that the nature of the Confidential Information and Trade Secrets that the Company has, and commits to continue to provide to Executive during Executive's employment would make it unlikely that Executive would be able to perform in a similar capacity for any person or entity engaging in a Competitive Activity (as defined below) without disclosing or utilizing the Confidential Information or Trade Secrets.

(b)     Confidential Information as used in this Agreement means an item of information or compilation of information in any form (tangible or intangible) related to the Business of the Company, as defined herein, or the Company Group, as defined herein, that Executive learns about through his employment with the Company and its Affiliates, is competitively sensitive, and that the Company has not made public or authorized public disclosure of, and that is not readily

9

*TS*

available to persons outside the Company Group through proper means who are not obligated to keep the item or compilation confidential. Confidential Information includes, but is not limited to, information that qualifies as a trade secret under applicable law, and Trade Secrets are specifically defined by applicable law. Confidential Information and Trade Secrets also include, but are not limited to, compilations of information, records, financial data, research, product plan, products, designs, drawings, engineering, hardware configuration, software programs, analytical data, specifications, and information regarding methods of doing business, sales materials, forecasts, marketing objectives and strategies, employee lists, employee compensation and any other information relating thereto, customer, supplier and client lists and preferences, price lists or pricing information, distribution strategies and procedures, operational and equipment techniques, business plans and systems, quality control procedures and systems, special projects and research, including market data or expansion plans, and any other records, applications, processes, data and information concerning the Business of the Company or Company Group, disclosed to Executive in writing, through access to the Company's computer system, orally or by drawings, or by observations of parts or equipment, which are not in the public domain. Confidential Information also includes information entrusted to the Company Group, in confidence by another party or subject to contractual confidentiality obligations. Confidential information further includes proprietary processes and procedures which include, but are not limited to, all such information regarding processes and procedures known or intended to be known only to employees of the Company Group, or others in a confidential relationship with the Company Group, which relates to the Business of the Company or Company Group's Business. Executive agrees that in light of his responsibilities for the Company Group, his role as CEO, and the services he provides to the Company and its Affiliates are unique in nature, and as consideration for the Company's providing to Executive such Confidential Information and Trade Secrets, entering into this Employment Agreement and continuing Executive's employment, and in order to protect such Confidential Information and Trade Secrets and prevent unfair competition by Executive or others:

(c)   Protection of Confidential Information.   During Executive's employment with Company and for as long thereafter as the Confidential Information and Trade Secrets continue to qualify as Confidential Information or Trade Secrets, Executive will not use, disclose, reproduce, or distribute any of the Company or Company Group's Confidential Information or Trade Secrets, or fail to take any action necessary to prevent any such information to lose its character or cease to qualify as Confidential Information or a trade secret, except as authorized and undertaken for the benefit of the Company as part of Executive's employment duties under this Agreement, or as permitted under Section 15 below. Executive agrees to use reasonable efforts to give the Company notice of any and all attempts to compel disclosure of any Confidential Information or Trade Secrets, in such a manner so as to promptly provide the Company with written notice that such disclosure is being or shall be compelled, whichever is earlier, so as to enable the Company to take prompt remedial action to preclude the disclosure of such information. Such written notice shall include a description of the information to be disclosed, the court, government agency, or other forum through which the disclosure is sought, and the date by which the information is to be

10

disclosed, and shall contain a copy of the subpoena, order, or other process used to compel disclosure.

(d)    Restrictions Against Unfair Competition. Executive agrees that he will not, during his employment (except at the direction and for the benefit of the Company) and for one (1) year thereafter (regardless of the reason his employment was terminated or the existence of any claims Executive may have or assert against the Company, its Affiliates, the Company Group, or any of their existing or former employees, officers, members, agents, investors, representatives, or principals), directly or Indirectly, own, manage, operate, join, control, be employed by or with, or participate in any manner with a Competing Business anywhere in the Restricted Territory where doing so will require Executive to provide, advise, manage, or supervise the same or substantially similar services to any Competing Business as those that Executive provided to the Company during his employment with the Company.

(i)    "Indirectly," as used in this Agreement, means that Executive will not assist others in performing those activities Executive is prohibited from engaging in directly in this Agreement.

(ii)    A "Competing Business" is any individual (including Executive), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is directly engaged in whole or in relevant part in any business or enterprise that is the same as, or substantially the same as, the Business of the Company, or that is taking material steps to engage in such business.

(iii)    The "Business of the Company" means a) construction, retrofit and maintenance or repair services in the electrical, mechanical, civil, or millwrighting trades and b) other such operations the Company or its Affiliates were engaged in during Executive's employment with the Company.

(iv)    The "Restricted Area" means:

(A)    Within the   state(s), and/or province(s) in which Executive otherwise worked for the Company or its Affiliates, represented the Company or its Affiliates, or performed services for the Company or its Affiliates; or

(B)    Had business contact with the Company's customers or prospective customers during his employment with the Company.

(C)    Executive agrees that these restrictions are reasonably limited in geographical scope based on the Company's business, and should be as broad as reasonably possible to protect the legitimate business interest of the Company and its Affiliates and that the full scope of the Restricted Area should be determined and defined at the time of termination of employment.

11

(v)     "Solicitation," as used in this Agreement, is understood to include all forms of pursuing, encouraging, or inducing a desired responsive action regardless of which party first initiates contact.

(e)     Non-Solicitation of Customers.

(i)     Executive agrees that while employed (except at the direction and for the benefit of the Company) and for a period of two (2) years following the voluntary or involuntary termination of Executive's employment for any reason and with or without cause (and regardless of the existence of any claims the Executive may have or assert against the Company, its Affiliates, the Company Group, or any of their existing or former employees, officers, members, agents, investors, representatives, or principals), Executive will not, either on behalf of Executive or for any Competing Business, directly or Indirectly Solicit, divert, or appropriate, or attempt to Solicit, divert, or appropriate any customer of the Company or its Affiliates or any prospective customer, with whom Executive has had contact during Executive's employment, or about whom Executive has any Confidential Information or Trade Secrets, or provided products or services to, or any prospective Customer that the Company or its Affiliates was planning to Solicit, submit bids, or to market the Company's Business (and Executive was aware of such plans during his employment) for the purposes of providing products or services that are the same as or substantially similar to those provided in the Business of the Company. As used in this Agreement, Solicitation (or to "Solicit") is understood to include all forms of pursuing, encouraging or inducing a desired responsive action regardless of which party first initiates contact

(f)     Non-Solicitation of Employees. Executive agrees that while employed by the Company and for two (2) years following the voluntary or involuntary termination of Executive's employment for any reason and with or without cause (and regardless of the existence of any claims the Executive may have or assert against the Company, its Affiliates, the Company Group, or any of their existing or former employees, officers, members, agents, investors, representatives, or principals), Executive will not directly or Indirectly Solicit, recruit, or encourage current employees or independent contractors of the Company or its Affiliates, or employees who have terminated their employment with the Company or its Affiliates within six (6) months of the Solicitation, recruitment, or encouragement, to work for, or provide services to a Competing Business. The definitions set forth in Section 4(d, as applicable, shall apply to this Section 4(f).

(g)     Non-Interference with Vendors and Suppliers. Executive agrees that while employed by the Company and following the voluntary or involuntary termination of Executive's employment for any reason and with or without cause (and regardless of the existence of any claims the Executive may have or assert against the Company its Affiliates, the Company Group, or any of their existing or former employees, officers, members, agents, investors, representatives, or principals), Employee will not directly or Indirectly interfere with the Company or its Affiliates' relationships with its Vendors and Suppliers in any manner that is prohibited by contract or law or

12

TS

which involves the use or disclosure of the Company or its Affiliates' Confidential Information or Trade Secrets.

(h)     Reasonableness of Restrictions. Executive agrees that the restrictions contained in Section 4, as applicable, allow Executive an adequate number and variety of employment alternatives based on Executive's varied skills and abilities. Accordingly, Executive covenants and warrants that he will not contend in any proceeding that the restraints contained in Section 4, as applicable, are unreasonable or greater than necessary to protect the Company or its Affiliates' Confidential Information or Trade Secrets, proprietary information and/or the goodwill or other business interests of the Company and its Affiliates.

(i)     Survival of Obligations. Sections 4, as applicable, and Section 5-16 hereof, shall survive material change in the Executive's position or terms and conditions of employment, and shall survive the expiration or termination of this Agreement and the termination of Executive's employment with the Company, regardless of which party terminates the Agreement or employment relationship between them, or why such termination occurs, or by any claims Executive may have or assert against the Company.

5.     Company Property.

(a)     Inventions. Any patents, inventions, discoveries, applications or processes, designs, devised, planned, applied, created, discovered developed, or which Executive contributed to, improved, or invented in the course of his employment under this Agreement and which pertain to any aspect of the business of the Company, shall be the sole and absolute property of the Company, and Executive shall make prompt report thereof to the Company. Executive agrees to and hereby does assign to the Company all rights, title and interest in such inventions, discoveries, applications or processes, designs, devised, planned, applied, created, discovered, developed, or which Executive contributed to, improved and any related patents or patent applications which pertain to the business in which the Company is engaged, is reasonably expected to engage or in which it has previously expressed an intention to enter. Executive agrees to cooperate with the Company in completing and executing any documents required to perfect the Company's interest in any intellectual property developed by or with the Executive, including to the extent such cooperation is required after termination. Employee agrees to promptly make full written disclosure to the Company, to hold in trust for the sole right and benefit of the Company, and hereby assigns to the Company, or its designee, all of Executive's right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks and trade secrets, whether or not patentable or registrable under copyright or similar laws, which Executive may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time Executive was in the employ of the Company (collectively, "Inventions"), together with all patent, copyright, mask work, trademark, trade secret, and other intellectual property rights therein throughout the world (collectively, "Intellectual Property Rights"). Executive further acknowledges that all original

13

works of authorship which are created by Executive (solely or jointly with others) within the scope of and during the period of Executive's employment with the Company and which are subject to copyright protection are "works made for hire" as that term is defined in the United States Copyright Act, and such works and all copyrights therein belong solely to the Company. Executive understands and agrees that the decision whether or not to commercialize or market any Invention is within the Company's sole discretion and for the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention.

(b)     Prior Works.  On or before the Effective Date of this Agreement, Executive will inform the Company in writing of any inventions, designs, improvements, applications, processes, discoveries, or designs devised, planned, applied, created, discovered, developed, or which Executive contributed to, improved, or invented prior to his employment with the ("Prior Inventions"), and in which Executive has any right, title, or interest.  Employee agrees that Employee will not use, incorporate, or permit to be used or incorporated, any Prior Invention with or into a Company product, process or service without the Company's prior written consent. Notwithstanding the foregoing sentence, if, in the course of Employee's employment with the Company, Employee uses with or incorporates into a Company product, process or service a Prior Invention, then Employee hereby grants to the Company a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such Prior Invention as part of or in connection with such product, process or service, and to practice any method related thereto. If Executive does not inform the Company of any such items as referenced in the first sentence of this Section 5(b), then Executive shall conclusively be deemed not to have any such inventions, designs, improvements, applications, processes, or discoveries, and all inventions, designs, improvements, applications, processes, and discoveries shall be deemed the property of the Company.

(c)     Return of Company Property.  All records, documents, emails, files, lists, including computer generated lists, reports, drawings, documents, equipment and similar items relating to the business of the Company or its Affiliates, which Executive prepared or received from the Company or its Affiliates, shall remain the sole and exclusive property of the Company.  Upon termination of this Agreement, Executive shall promptly return to the Company all of the above described property of the Company or its Affiliates, in his possession, regardless of the medium in which it is stored. Executive further represents that he will not copy or cause to be copied, printed or cause to be printed out any of the described Company property, software, documents or other materials originating with or belonging to the Company.  Executive additionally represents that, upon termination of his employment with the Company, he will not retain in his possession any of the above described company property, or such software, documents or other materials pertaining to the Company or its Affiliates, regardless of the medium in which it may be stored, and will execute an acknowledgment of compliance with this Section 5(c) on request by the Company.  Any access of the Company's computer systems in order to compete or prepare to compete with Company is unauthorized harmful access, prohibited by the Company.

14

6.     Remedy.  It is mutually understood and agreed that Executive's services are special, unique, unusual, extraordinary and of an intellectual character giving them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law. Executive acknowledges that Executive's violation of the provisions of Sections 4 and 5 of this Agreement will cause irreparable harm to the Company, and Executive agrees that the Company shall be entitled as a matter of right to an injunction restraining any violation or further violation of such provisions by Executive or others acting on Executive's behalf, without any showing of irreparable harm and without any showing that the Company does not have an adequate remedy at law. Executive further covenants and warrants that Executive will not dispute in any proceeding that any given violation or further violation of the covenants contained in Sections 4 and 5 will result in irreparable harm to the Company and/or could not be remedied adequately at law. Executive agrees that the period of time that he is in breach of the provisions of Section 4 shall extend the period of restrictions set forth therein by an equal amount.  The Company's right to injunctive relief shall be cumulative and in addition to any other remedies provided by law or equity.  In addition, the Company shall be entitled to reimbursement from Executive for any and all reasonable attorneys' fees and expenses incurred by it in enforcing Sections 4 and/or 5 of this Agreement.

7.     Representations and Warranties of Executive.

(a)     In order to induce the Company to enter into this Agreement, Executive hereby represents and warrants to the Company as follows: (i) Executive has the legal capacity and unrestricted right to execute and deliver this Agreement and to perform all of his obligations hereunder; (ii) the execution and delivery of this Agreement by Executive and the performance of his obligations hereunder will not violate or be in conflict with any fiduciary or other duty, instrument, agreement, document, arrangement or other understanding to which Executive is a party or by which he is or may be bound or subject; (iii) Executive, if he is a party to any instrument, agreement, document, arrangement or other understanding with any person (other than the Company) requiring or restricting the use or disclosure of any confidential information, Executive represents (a) that has returned all such information to such prior entity, (b) that he has not retained any such information, (c) that he will not, and has not disclosed to anyone within the Company of any of its Affiliates such information, and (d) that he will not use or disclose such information in the performance of his duties under this Agreement. Violation of these representations will be immediate grounds to terminate Executive's employment for Cause.

(b)     Executive hereby agrees to indemnify and hold harmless the Company from and against any and all losses, costs, damages and expenses (including, without limitation, its reasonable attorneys' fees) incurred or suffered by the Company resulting from any breach by Executive of any of his representations or warranties set forth in Paragraph 7(a) hereof.

8.     Directors and Officers Insurance.  Executive shall be covered under the Directors and Officer's Insurance policy provided by the Company for its officers and directors, and such

15

coverage shall provide coverage of Executive for a period of three (3) after his employment has ended; provide however, that this provision does not require the Company to maintain a specific Directors and Officers Insurance Policy as long as such policy(s) provides coverage for Executive on the same terms and conditions as the Company's existing officers and directors.

9.      <u>Notices</u>.  Any notices provided hereunder must be in writing and shall be deemed to have been received upon the earlier of personal delivery (including hand-delivery and personal delivery by facsimile transmission) or the third day after mailing by first class mail or overnight delivery, to the Company at its primary office location and to Executive at his address as listed on the Company's payroll at the time notice is given.

10.     <u>Entire Agreement</u>.  This Agreement constitutes the entire understanding of the parties with respect to its subject matter and no change, addition, alteration or modification to the terms of Executive's employment or this Agreement may be made except in writing signed by the parties hereto.  Any prior or other agreements, promises, negotiations or representations not expressly set forth in this Agreement are of no force or effect.

11.     <u>Severability and Reformation</u>.  Employee and the Company agree that if any particular sections, sub-sections, phrases, words, or other portions of this Agreement are determined by an appropriate court to be invalid or unenforceable as written, the court shall so modify them as necessary to be valid or enforceable to the fullest extent possible to provide the Company with the benefit of its agreement with Employee, and such modification shall not affect the remaining provisions of this Agreement, or if they cannot be modified to be made valid or enforceable, then they shall be severed from this Agreement, and all remaining terms and provisions shall remain enforceable.

12.     <u>Waiver</u>.  No waiver of any provision shall be deemed to have occurred unless memorialized in writing signed by the waiving party.  If either party should waive any breach of any provision of this Agreement, Executive or the Company will not thereby be deemed to have waived any preceding or succeeding breach of the same or any other provision of this Agreement.

13.     <u>Assignment</u>.  Neither this Agreement, nor any of Executive's rights, powers, duties or obligations hereunder, may be assigned by Executive. This Agreement shall be binding upon and inure to the benefit of Executive and his heirs and legal representatives and the Company and its successors and assigns. Successors of the Company shall include, without limitation, any corporation or corporations to which this Agreement is assigned, or which acquires, directly or indirectly, all or substantially all of the assets of the Company, whether by merger, consolidation, purchase, or otherwise, and such successor shall thereafter be deemed "the Company" for the purpose hereof.

14.     <u>Choice of Law, Agreement to Arbitrate and Waiver of Jury Trial</u>.  The Agreement is governed by the Federal Arbitration Act, and evidences a transaction involving commerce.

16

Aside from the Company Parties' (as defined below) sole right to pursue any and all relief, including damages and injunctive relief pursuant to Executive's breach of Sections 4 and 5 of this Agreement, in any court of competent jurisdiction in which Executive performed services for the Company and its Affiliates under this Agreement (and Executive hereby consents to personal jurisdiction and venue in such state), if any other dispute arises out of this Agreement between the Parties, or by or against any of the Company's Affiliates or subsidiaries, officers, directors, members, owners, or employees ("Company Parties"), involving Executive's hiring, retention, compensation, bonus, equity or Executive's employment or separation from employment with the Company for any reason, or claims of fraud, misrepresentation, negligence, emotional distress, breach of fiduciary duty, or defamation (including post-employment defamation) or any other contractual, statutory or common law claims, and if the Parties to this Agreement cannot resolve the dispute, the dispute shall be submitted to final and binding arbitration, provided however, that regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits such notwithstanding the existence of an agreement to arbitrate. Executive and the Company Parties agree to bring any dispute in arbitration on an individual basis only, and not as a class or collective action. There will be no right or authority for any dispute to be brought, heard or arbitrated as a class or collective action ("Class Action Waiver"). Claims may not be joined or consolidated in arbitration with disputes brought by any other person or entity. The Class Action Waiver shall not be severable from this Agreement in any case in which the dispute is filed or pursued as a class or collective action. Regardless of anything else in this Agreement and/or the applicable rules or procedures of any arbitration-sponsoring organization, the interpretation, applicability, enforceability or formation of the Class Action Waiver may only be determined by a Court and not an arbitrator. Before initiating arbitration, Executive must submit a written demand to the Company Parties, providing a detailed explanation of his allegations against the Company Parties. Executive agrees to provide the Company Parties 60 days to attempt to resolve his allegations before filing his demand for arbitration. Thereafter, Executive and the Company Parties agree to mediate their dispute before taking any action in the arbitration beyond filing the initial demand and answering statement in arbitration. The arbitration shall be conducted in accordance with the JAMS Employment Arbitration Rules and Procedures ("JAMS") then in effect. If the parties cannot agree to an arbitrator, an arbitrator will be selected through the JAMS's standard procedures and Rules. The Company and Executive shall share the costs of arbitration including services of a court reporter, unless the arbitrator rules otherwise; provided however each side shall be responsible for its own attorney's fees and expenses, and fees and expenses of any expert witness. The Company Parties and Executive agree that the arbitration shall be held in the county of the Company's corporate office, and Delaware law shall apply and govern the parties' dispute, claims and remedies, except for any matters arising under federal law, in which case federal law shall apply, and that judgment may be entered on the arbitrator's award by any court having jurisdiction thereof. Arbitration of all disputes between the Executive and Company Parties is mandatory (except those which involve work place injuries covered under state workers compensation law or entitlement to benefits under an ERISA covered plan), and in lieu of any and all civil causes of action or lawsuits which Executive or the Company Parties may have against the other, with the exception that Company

17

TS

Parties alone may seek a temporary restraining order, temporary injunctive and permanent injunctive relief in a court to enforce the covenants as provided in Sections 4 and 5, and if such relief is granted, in addition to any other remedy provided herein, the Company Parties shall be entitled to recover its attorney's fees from Executive. The Company Parties and Executive acknowledge that by agreeing to this provision, they knowingly and voluntarily waive any right they may have to a jury trial based on any claims they may against each other, including any right to a jury trial under any local, municipal, state or federal law including, without limitation, claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 1981, the Americans With Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967, the Family Medical Leave Act, the Sarbanes-Oxley Act, the Older Workers Benefit Protection Act, the Fair Labor Standards Act, or similar state laws, claims of harassment, whistleblower, retaliation, discrimination or wrongful termination, and any other statutory or common law claims. The prevailing party in any dispute under this Agreement shall be entitled to an award of its reasonable costs, including without limitation attorneys' fees, and all damages or relief to the extent permitted under Delaware or Federal law. Arbitration awards, findings, and determinations of disputes under this Agreement shall be kept confidential by the parties, except to the extent disclosure of the terms of such awards, findings or determinations are required to be disclosed by law or court order, in which case (a) the disclosing party shall provide the other party as much advance notice of such required disclosure as is practicable and shall cooperate in all reasonable respects with any efforts by such other party (at such other party's expense) to limit or restrict such required, and (b) the disclosing party shall limit such required disclosures to the information that is legally required to be disclosed. However, nothing in this section relieves either Party from exhausting any administrative remedy prior to the commencement of arbitration proceeding, including the filing of administrative charges with any federal, state or local agency, including the Equal Employment Opportunity Commission or equivalent state agency. Similarly, this Agreement does not preclude the Parties from conciliating any administrative and informal complaint proceeding before an appropriate governmental agency. Moreover, nothing in this Agreement shall be construed to require an arbitration of a claim for unemployment compensation or a claim subject to the jurisdiction of the National Labor Relations Board.

15.    _Limitations of Restrictions_. Nothing in this Agreement (a) prohibits Executive from reporting an event that Executive reasonably and in good faith believes is a violation of law to the relevant law-enforcement agency (such as the Securities and Exchange Commission), (b) requires notice to or approval from the Company before doing so, or (c) prohibits Executive from cooperating in an investigation conducted by such a government agency; Executive is also hereby provided notice that under the 2016 Defend Trade Secrets Act (DTSA): (d) no individual will be held criminally or civilly liable under Federal or State trade secret law for the disclosure of a trade secret (as defined in the Economic Espionage Act) that: (i) is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and made solely for the purpose of reporting or investigating a suspected violation of law; or, (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal so that it is not made public; and, (iii) an individual who pursues a lawsuit for retaliation by

18

an employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except as permitted by court order. Notwithstanding the foregoing, under no circumstance is Executive authorized to disclose any information covered by the Company's attorney-client privilege or attorney work without prior written consent of the Board.

16.    Survival and Construction.  Executive's obligations under this Agreement will be binding upon Executive's heirs, executors, assigns, and administrators and will inure to the benefit of the Company, its subsidiaries, successors, and assigns. The Company's obligations under this Agreement will be binding upon the Company's successors assigns and will inure to the benefit of Executive and Executive's heirs, executors, and administrators. The language of this Agreement shall in all cases be construed as a whole according to its fair meaning, and not strictly for or against any of the patties. The paragraph headings used in this Agreement are intended solely for convenience of reference and shall not in any manner amplify, limit, modify, or otherwise be used in the interpretation of any of the provisions hereof. Executive may not assign, pledge, grant a security interest in, hypothecate, or otherwise transfer any of its rights, duties, or obligations hereunder.

17.    Acknowledgment.  Executive has carefully read all of the provisions of this Agreement and agrees that (a) the same are necessary for the reasonable and proper protection of the Company's business, trade secrets, and Confidential Information as defined in Section 4 above; (b) the Company has been induced to enter into and continue its relationship with Executive in reliance upon his compliance with the provisions of this Agreement; (c) every provision of this Agreement is reasonable with respect to its scope and duration; (d) Executive understands the terms and conditions of this Agreement, has had the opportunity to review the terms and conditions with counsel of his own choosing, and has executed this Agreement freely and voluntarily without duress or coercion from any source.

IN WITNESS WHEREOF, THE PARTIES CONFIRM THEIR ACCEPTANCE OF THIS AGREEMENT, ON THE EFFECTIVE DATE STATED ABOVE, BY AFFIXING THEIR

19

**Thomas Santoni Employment Agreement [Execution Version]**

SIGNATURES IN THE PLACE INDICATED BELOW.

COMPANY

THE STATE GROUP INDUSTRIAL (USA) LIMITED

By:_____

Title:_____


EXECUTIVE

_____

THOMAS SANTONI

## ATTACHMENT A

**[Form Severance Agreement and General Release-- this Release may change based on legal developments and evolving best practices]**

[Form Release Agreement]

36130360.2

21