Exhibit 2

**THE STATE GROUP HOLDINGS PARTNERS LP**

---

**AMENDED AND RESTATED
LIMITED PARTNERSHIP AGREEMENT**

---

**April 3, 2018**

# TABLE OF CONTENTS

## ARTICLE 1
## INTERPRETATION

| | | |
|---|---|---|
| 1.1 | Defined Terms | 3 |
| 1.2 | Rules of Construction | 9 |
| 1.3 | Accounting Principles | 10 |
| 1.4 | Entire Agreement | 10 |
| 1.5 | Time of Essence | 11 |
| 1.6 | Governing Law and Submission to Jurisdiction | 11 |
| 1.7 | Severability | 11 |

## ARTICLE 2
## FORMATION AND NAME OF THE PARTNERSHIP

| | | |
|---|---|---|
| 2.1 | Formation | 11 |
| 2.2 | Name | 11 |
| 2.3 | Declaration of Limited Partnership | 11 |
| 2.4 | Purpose of the Limited Partnership | 12 |
| 2.5 | Nature of the Limited Partnership | 12 |
| 2.6 | Principal Place of Business | 12 |
| 2.7 | Fiscal Year | 12 |

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| 3.1 | Representations and Warranties of the General Partner | 13 |
| 3.2 | Representations and Warranties of the Limited Partners | 13 |
| 3.3 | Survival of Representations, Warranties and Covenants | 14 |

## ARTICLE 4
## UNITS AND CAPITAL CONTRIBUTIONS

| | | |
|---|---|---|
| 4.1 | Units and General Partner Interest | 14 |
| 4.2 | Equality of Limited Partners | 15 |
| 4.3 | Creation of Additional Units | 15 |

4.4     Register ...................................................................................... 15

4.5     No Fractional Units .................................................................. 16

4.6     No Distribution to the Public .................................................... 16

4.7     Initial Capital Contributions .................................................... 16

4.8     Additional Capital Contributions ............................................ 16

4.9     Admission of Additional Limited Partners ............................. 16

## ARTICLE 5
## ALLOCATION OF INCOME AND LOSSES

5.1     Allocations of Income and Losses ......................................... 17

5.2     Tax Allocations ........................................................................ 17

5.3     Limited Liability of Limited Partners ...................................... 17

5.4     No Partition ............................................................................. 17

5.5     Withdrawal .............................................................................. 18

## ARTICLE 6
## REIMBURSEMENT OF GENERAL PARTNER

6.1     Expenses Only ........................................................................ 18

## ARTICLE 7
## CAPITAL ACCOUNTS AND ADDITIONAL CONTRIBUTIONS

7.1     Capital Accounts ..................................................................... 18

7.2     No Right to Withdraw Capital .................................................. 18

7.3     No Interest ............................................................................... 19

7.4     Negative or Zero Balance in Capital Account ...................... 19

7.5     Payment of Contribution and Advances of Loans .............. 19

## ARTICLE 8
## DISTRIBUTIONS

8.1     Timing and Amount of Distributions ..................................... 19

8.2     Tax Distributions .................................................................... 19

8.3     Distributions in Kind ............................................................... 20

8.4     Amount and Priority of Distributions ..................................... 20

8.5     Limitations on Distributions ...................................................................21

8.6     Payments of Distributions ....................................................................21

**ARTICLE 9**
**CONTROL AND MANAGEMENT**

9.1     Management by General Partner: Powers of the General Partner ...................21

9.2     Standard of Care........................................................................................25

9.3     Other Matters Concerning the General Partner.......................................25

9.4     Restrictions on General Partner ...............................................................25

9.5     Restrictions on Limited Partners .............................................................26

9.6     General Partner Indemnity ......................................................................27

9.7     Books and Records...................................................................................27

9.8     Income Tax Information ...........................................................................27

9.9     Access to Information ..............................................................................28

9.10    Reports ....................................................................................................28

9.11    Removal of General Partner .....................................................................28

**ARTICLE 10**
**DURATION**

10.1    Termination Events ..................................................................................29

10.2    Liquidation ..............................................................................................29

10.3    Termination..............................................................................................30

10.4    Rights and Obligations of Partners during Winding-Up Period ............30

10.5    General Partner Corporate Existence .....................................................30

10.6    Continuation of Partnership......................................................................30

**ARTICLE 11**
**TRANSFER OF INTERESTS**

11.1    General Prohibition on Transfer .............................................................31

11.2    Transfer of General Partner Interest.......................................................31

11.3    Encumbrance of General Partner Interest...............................................31

11.4    Transfer of Units .................................................................................................31

**ARTICLE 12**
**PERMITTED TRANSFERS**

12.1    Consent ...............................................................................................................33

12.2    Transfers to Affiliates .........................................................................................33

12.3    Incapacity, Separation of Service or Other Specified Event ..............................33

12.4    Tag-Along Rights ................................................................................................34

12.5    Drag-Along Rights...............................................................................................34

12.6    Pledge of Units ...................................................................................................36

**ARTICLE 13**
**PRE-EMPTIVE RIGHTS**

13.1    Pre-Emptive Rights.............................................................................................36

**ARTICLE 14**
**EXCULPATION AND INDEMNIFICATION**

14.1    Exculpation .........................................................................................................38

14.2    Liabilities and Duties of Covered Persons..........................................................39

14.3    Indemnification....................................................................................................39

**ARTICLE 15**
**RESTRICTIVE COVENANTS**

15.1    Non-Solicitation...................................................................................................40

15.2    Non-Disparagement ............................................................................................41

15.3    Confidentiality .....................................................................................................41

**ARTICLE 16**
**MISCELLANEOUS**

16.1    Notices ................................................................................................................42

16.2    Amendments and Waivers ..................................................................................43

16.3    Status Reports ....................................................................................................43

16.4    Successors and Assigns .....................................................................................43

16.5    Further Assurances.............................................................................................43

16.6    Claims..................................................................................................................44

16.7    Disputes..................................................................................................44

16.8    Counterparts..........................................................................................45

SCHEDULES:

Schedule A – Form of Assumption Agreement

## AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT

THIS AGREEMENT made as of the 3rd day of April, 2018,

B E T W E E N :

**THE STATE GROUP HOLDINGS GP LLC**,
a limited liability company existing under the laws of
the State of Delaware,

(hereinafter referred to as the "**General Partner**"),

- and -

**BW CAYMAN AIV IV, L.P.**,
a limited partnership existing under the laws of the
Cayman Islands,

(hereinafter referred to as "**BWF LP**"),

- and -

**YP BUILDERS LIMITED PARTNERSHIP,**
a limited partnership existing under the laws of the
Province of Ontario,

(hereinafter referred to as "**YPF LP**"),

- and -

**STEVE THEODORU LIVING TRUST,**
a trust existing under the laws of the State of
Indiana,

(hereinafter referred to as "**ST**"),

- and -

**LUKE JONES**
an individual residing in the City of Newburgh, in
the State of Indiana,

(hereinafter referred to as "**LJ**"),

- and -

**TIM KOIVISTO**
an individual residing in the City of Evansville, in
the State of Indiana,

(hereinafter referred to as "**TK**"),

- and -

**STEVE WEBER**
an individual residing in the City of Washington, in the State of Michigan,

(hereinafter referred to as "**SW**"),

- and -

**JOHN SCHAUERMAN**
an individual residing in the City of Scottsdale, in the State of Arizona,

(hereinafter referred to as "**JS**", and, together with LJ, ST, TK and SW, the "**US Management Holders**"),

- and -

**THE STATE GROUP MANAGERS LLC**
a limited liability company existing under the laws of the State of Delaware,

(hereinafter referred to as "**Employeeco**"),

- and -

Each party who, from time to time, becomes a limited partner in accordance with the terms of this Agreement,

(together with BWF LP, YPF LP, the US Management Holders and Employeeco, the "**Limited Partners**").

AND WHEREAS the State Group Holdings Partners LP (the "**Partnership**") was formed as a limited partnership under the laws of the Province of Ontario on March 23, 2018 by the filing of a Declaration pursuant to the Act and by entering into a limited partnership agreement dated as of March 23, 2018 (the "**Initial Partnership Agreement**") governing the business and affairs of the Partnership;

AND WHEREAS the General Partner, BWF LP and the other Limited Partners admitted to the Partnership on the date of this Agreement wish to amend and restate the Initial Partnership Agreement to further establish and document their respective rights, obligations and liabilities in respect of the Partnership, and certain other matters, as hereinafter set forth;

NOW THEREFORE THIS AGREEMENT WITNESSES THAT, in consideration of the respective covenants and agreements herein contained and for other good and valuable

consideration (the receipt and sufficiency of which are hereby acknowledged), the parties agree as follows:

## ARTICLE 1
## INTERPRETATION

**1.1**     **Defined Terms**

For the purposes of this Agreement, unless the context otherwise requires, the following terms shall have the respective meanings set out below and grammatical variations of such terms shall have corresponding meanings:

"**Act**" means the *Limited Partnerships Act* (Ontario), as it may be amended or replaced from time to time;

"**ADR Institute**" has the meaning set out in Section 16.7(b);

"**Affiliate**" means, when used with referenced to a specified person, (i) any person that, directly or indirectly, controls, is controlled by, or is under common control with the specified person, and (ii) each Family Member of such person.  For this purpose, "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise.  Notwithstanding the foregoing, the Partnership shall not be considered to be an Affiliate of any Partner, and no Partner shall be considered to be an Affiliate of the Partnership or any other Partner, solely by reason of a Partner's Units in the Partnership or service on the board of managers of the General Partner or appointment of a representative to serve on the board of managers of the General Partner;

"**Approved by**", "**Approval of**", "**Consent of**", "**Decision of**", "**Determined by**," or any equivalent, each mean, with respect to the General Partner, approval, consent or determination of the General Partner in accordance with any relevant provisions of the LLC Agreement;

"**Auditor**" means Deloitte LLP or such other firm whose partners are members, in good standing, of the Canadian Institute of Chartered Accountants and which is appointed from time to time as auditor of the Partnership by the General Partner;

"**Business**" means the business of providing electrical and mechanical construction services and maintenance services for the industrial and commercial sectors carried on by the subsidiaries of the Partnership;

"**Business Day**" means any day, other than a Saturday, Sunday or statutory holiday in the Provinces of Ontario or British Columbia, on which commercial banks in Toronto, Ontario or Vancouver, British Columbia are open for business;

"**Canadian Management Holders**" means the direct or indirect equity owners of Employeeco (other than BWF LP);

"**Canadian Subsidiary**" means The State Group Canada Inc. or any successor thereto;

"**Capital Account**" means the account maintained for a Partner in accordance with the provisions of Section 7.1;

"**Capital Contribution**" means the total cash and fair market value of other property contributed to the Partnership by a Partner, as determined in good faith by the General Partner;

"**Change of Control**" means:

(a)     with respect to a corporation, the issue of additional treasury shares of the corporation, the sale, transfer, assignment, transmission on death or other disposition by operation of law or otherwise of outstanding shares of the corporation, the redemption or cancellation of outstanding shares of the corporation or the amalgamation or merger of the corporation with any other corporate entity that results in any change in the control of such corporation by the person or persons holding Control of such corporation immediately prior to such event; and

(b)     with respect to a partnership, trust, joint venture, co-ownership arrangement or other business entity, the creation, issuance, sale, transfer, assignment, transmission on death, redemption, cancellation or other disposition of shares, units or voting interests (including, in respect of a trust, interests which entitle the holder thereof to elect or appoint the majority of the trustees of the trust) in or of such business entity that results in any change in the control by the person or persons holding control of such business entity immediately prior to such event;

"**Class A Unit**" means a class A Unit in the Partnership;

"**Confidential Information**" has the meaning set out in Section 15.3;

"**Covered Person**" means (i) the General Partner and (ii) each officer, manager, shareholder, partner, member, employee, agent or representative of the General Partner.

"**Declaration**" means the declaration filed under the Act establishing the Partnership as a limited partnership, as the same may be amended from time to time;

"**Disputes**" has the meaning set out in Section 16.7(a);

"**Distributable Cash**" means, for any Fiscal Year, the cash proceeds from Partnership operations (plus any reductions in amounts previously set aside as reserves to the extent previously reducing Distributable Cash) net of all Partnership expenses for such period and less any amounts reasonably set aside as and/or added to reserves for anticipated Partnership expenses, debt payments, capital improvements, replacements and contingencies, plus any reserves in respect of prior periods, all as determined by the General Partner in accordance with the terms of this Agreement;

"**Drag-Along Notice**" has the meaning set out in Section 12.5;

"**Drag-Along Sale**" has the meaning set out in Section 12.5;

"**EBITDA**" means, in respect of any person, such person's earnings before interest, taxes, depreciation and amortization, as calculated in accordance with GAAP;

"**Employeeco Agreement**" means the limited liability agreement of Employeeco effective as of April 3, 2018, as such agreement may be amended or supplemented from time to time;

"**Encumbrance**" includes any pledge, encumbrance, lien, hypothecation or grant of security interest;

"**Exempted Matter**" means (i) entering into the Management Services Agreement in the form presented to YPF LP on the date hereof, (ii) matters permitted by Section 7.12(b) of the LLC Agreement, and (iii) new financings in which YPF LP or its Affiliates are offered the right to participate on a pro rata basis (and for greater certainty Exempted Matters do not include the list of items for which pre-emptive rights are not required to be offered to YPF LP or its Affiliates under Section 13.1(a) unless YPF LP or its Affiliates are actually offered the right to purchase its pro rata portion in connection therewith);

"**Fair Market Value**" means in respect of a Limited Partner's Units or in respect of investments, securities, or other assets of the Partnership, the present fair market value of such Units, investments, securities, or assets as determined in good faith by the General Partner;

"**Family Member**" means, with respect to any person who is an individual, each parent, spouse or partner, sibling or child (including those adopted) of such individual and each custodian or guardian of any property of one or more of such persons in the capacity as such custodian or guardian;

"**Fiscal Year**" has the meaning set out in Section 2.7;

"**GAAP**" has the meaning set out in Section 1.3;

"**General Partner**" means BW State Group Holdings, LLC and any person who is admitted to the Partnership as the successor to, or the permitted assign of, the General Partner;

"**General Partner Interest**" has the meaning set out in Section 4.1(b);

"**Incapacity**" means, as to any person, including, without limitation, a Management Holder, (i) the adjudication of incompetence or insanity, the filing of a voluntary petition in bankruptcy, the entry of an order of relief in any bankruptcy or insolvency proceeding or the entry of an order that such person is bankrupt or insolvent, or (ii) the death, dissolution or termination (other than by merger or consolidation), as the case may be, of such person;

"**Indebtedness**" means, with respect to any person, (i) indebtedness of such person for borrowed money, (ii) other indebtedness of such person evidenced by notes, bonds or debentures, (iii) capitalized leases classified as indebtedness of such person under GAAP, (iv) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such person (even though the rights and remedies of the seller or lender under such agreement in the event of default

are limited to repossession or sale of such property), (v) any obligation of such person for the deferred purchase price of property or services (other than trade payables and other current liabilities), (vi) any Indebtedness of another person referred to in clauses (i) through (v) above guaranteed directly or indirectly, jointly or severally, in any manner by such person, (vii) any Indebtedness referred to in clauses (i) through (v) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien or encumbrance on property (including, accounts and contract rights) owned by such person, even though such person has not assumed or become liable for the payment of such Indebtedness, and (viii) the maximum amount of all direct or contingent obligations of such person with respect to letters of credit, bankers' acceptances, bank guaranties, surety bonds or similar facilities or instruments;

"**Indirect Change of Control**" means any Change of Control of the legal or beneficial owner of an Interest or of any person which controls, directly or indirectly, in any manner whatsoever, such legal or beneficial owner of the Interest where the primary purpose of such Change of Control is to transfer such Interest indirectly and thus achieve what is not expressly permitted by this Agreement;

"**Indirect Ownership Percentage**" means, as to any person, including any Canadian Management Holder, such person's indirect ownership percentage in Employeeco, as set out in Annex B to the Employeeco Agreement;

"**Initial Partnership Agreement**" has the meaning set out in the recitals;

"**Interest**" means, in respect of a Partner, such Partner's General Partner Interest or Units, as applicable;

"**Invested Capital**" means, with respect to each Class A Unit, an amount equal to $1.00 less all distributions of invested capital previously made by the Partnership in respect of such Unit pursuant to Section 8.4 and with respect to each future Unit issued for cash or other consideration after the date of this Agreement, an amount equal to the price determined by the General Partner in good faith less all distributions of invested capital previously made by the Partnership in respect of such Unit;

"**Limited Partners**" means the persons identified on the signature page of this Agreement as limited partners, in their capacity as limited partners of the Partnership, and each person who is admitted to the Partnership as a Limited Partner pursuant to Section 11.4(b), in each case so long as such person continues to be a limited partner hereunder;

"**Liquidating Partner**" has the meaning set out in Section 10.2(a);

"**LLC Agreement**" means the limited liability agreement of the General Partner effective as of April 3, 2018, as such agreement may be amended or supplemented from time to time;

"**Management Holders**" means the US Management Holders and the Canadian Management Holders;

"**Management Services Agreement**" means the Management Services Agreement dated as of the date hereof between the General Partner and Blue Wolf Capital Partners LLC;

"**Net Income**" means the net income of the Partnership for a Fiscal Year determined in accordance with GAAP, less provisions for reserves required to be maintained by this Agreement;

"**Net Loss**" means the net loss of the Partnership for a Fiscal Year determined in accordance with GAAP, further reduced by provisions for reserves required to be maintained by this Agreement;

"**Offered Securities**" has the meaning set out in Section 13.1(a);

"**Offering Notice**" has the meaning set out in Section 13.1(b);

"**Option Period**" has the meaning set out in Section 13.1(c);

"**Other Specified Event**" means, as to any person, including, without limitation, a Management Holder, the (i) conviction of such person of a criminal offense or (ii) material breach by such person of this Agreement or the Employeeco Agreement.

"**Partners**" means, collectively, the Limited Partners and the General Partner;

"**Partnership**" has the meaning set out in the recitals;

"**Permitted Transferee**" of any person means:

(a)     in the case of a person who is a natural person: (i) the spouse of such person; (ii) any lineal descendant of such person or a spouse of any such descendant; (iii) a trust (including a testamentary trust) solely for the benefit of one or more of such person, the spouse of such person or any lineal descendant of such person or a spouse of any such descendant; (iv) any self-directed RRSP controlled by such person; or (v) a corporation of which all of the voting shares are owned by such person and the remaining outstanding shares of each other class of shares of such corporation are beneficially owned, directly or indirectly, in any manner (including through intermediary corporations or trusts), by one or more of such persons, the spouse of such person, any lineal descendant of such person or a spouse of any such descendant or such trust; and includes the legal personal representative(s) of such person or any person referred to in (d) below;

(b)     in the case of a person who is a corporation or a partnership, any Affiliate of such person;

(c)     in the case of a person which is a trust: (i) any beneficiary of such trust; (ii) another trust, provided that the class of beneficiaries is limited to the beneficiaries of such trust or Permitted Transferees of such beneficiaries; and

(d)     in the case of a person which is an estate of a deceased person, a Permitted Transferee of such deceased person determined pursuant to this definition as if

such person were not deceased or a legal personal representative of such deceased person;

"**person**" includes any natural person, corporation, partnership, limited liability company, unincorporated association, joint venture, firm and any other organization, association or other entity, and any trust or estate;

"**Phantom Unit Plan**" means a plan, arrangement or agreement adopted by the Partnership or any of its subsidiaries to pay bonus compensation amounts to any person who is employed by or otherwise performs services for the Partnership or any of its subsidiaries, setting forth such conditions, restrictions and vesting schedules (if any) as shall be determined by the General Partner with respect to all or a portion of the bonus compensation obligations of the Partnership or any of its subsidiaries to such person;

"**Preferred Return**" means 8% per annum, compounded monthly;

"**Principal Partners**" means BWF LP and YPF LP, and their respective successors and Permitted Transferees;

"**Pro Rata Percentage**" of any Partner means such Partner's pro rata ownership percentage of the aggregate number of Units then outstanding, calculated by dividing the number of Units held by such Partner by the total outstanding Units, expressed as a percentage;

"**Register**" has the meaning set out in Section 4.4;

"**Related Party**" means an Affiliate of a Limited Partner or any fund, corporation or partnership being managed by a majority of the same individuals managing such Limited Partner or any Person not at arm's length (as determined pursuant to the Tax Act) from any of them;

"**Restricted Partner**" has the meaning set out in Section 15.1(a);

"**Restricted Period**" has the meaning set out in Section 15.1(a);

"**Separation from Service**" means, as to any person, including, without limitation, a Management Holder, the ceasing of such person to render full-time or part-time services as an employee, consultant or other service provider for and on behalf of the Management Holder, Employeeco or the Partnership for any reason or for no reason, including, without limitation, the death, bankruptcy, dissolution, insanity, incompetency or other legal incapacity, or the voluntary termination, involuntary termination, withdrawal, retirement, resignation or expulsion of such person;

"**Subscription Notice**" has the meaning set out in Section 13.1(c);

"**Substitute Limited Partner**" has the meaning set out in Section 11.4(b);

"**Tag-Along Notice**" has the meaning set out in Section 12.4(a);

"**Tag-Along Partners**" has the meaning set out in Section 12.4(a);

"**Tax Act**" means the *Income Tax Act* (Canada) and regulations thereunder, as amended;

"**Tax Distribution**" has the meaning set out in Section 8.2;

"**Taxable Income**" means the amount of income of the Partnership for a Fiscal Year computed in accordance with the provisions of the Tax Act;

"**Taxable Loss**" means the amount of loss of the Partnership for a Fiscal Year computed in accordance with the provisions of the Tax Act;

"**Taxes**" means all present and future taxes, surtaxes, duties, levies, imposts, rates, fees, assessments and similar governmental charges of any nature, together with any and all fines, interest, penalties, or other additions thereto, thereon, in lieu thereof or for non-collection or in respect thereof imposed upon or payable by any person by or to any national, federal, territorial, state, provincial or local government, political subdivision, or taxing authority in any country;

"**Third-Party Transferee**" means any Transferee who is not a Permitted Transferee;

"**Transfer**" or "**transfer**" includes any sale, exchange, transfer, assignment, gift, alienation or other transaction, whether voluntary, involuntary or by operation of law, by which the legal or beneficial ownership of, or any other interest in an Interest, passes from one person to another, or to the same person in a different capacity, whether or not for value, and any Indirect Change of Control, and "**to transfer**", "**transferred**" and similar expressions shall have corresponding meanings;

"**Transferee**" means any person that is, or is proposed to be, a transferee of an Interest in the Partnership;

"**Transferor**" means any Partner that proposes to Transfer or does Transfer its Interest in the Partnership;

"**Unit**" means a Class A Unit of the Partnership;

"**US Management Holders**" has the meaning set out in the recitals; and

"**US Subsidiary**" means The State Group USA Inc. or any successor thereto.

**1.2**     **Rules of Construction**

Except as may be otherwise specifically provided in this Agreement and unless the context otherwise requires, in this Agreement:

(a)     the terms "Agreement", "this Agreement", "the Agreement", "hereto", "hereof", "herein", "hereby", "hereunder" and similar expressions refer to this Agreement in its entirety and not to any particular provision hereof;

(b)     references to an "Article", "Section", "Schedule" or "Exhibit" followed by a number or letter refer to the specified Article or Section of or Schedule or Exhibit to this Agreement;

(c)     the division of this Agreement into articles and sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement;

(d)     words importing the singular number only shall include the plural and vice versa and words importing the use of any gender shall include all genders;

(e)     the word "including" is deemed to mean "including without limitation";

(f)     the terms "party" and "the parties" refer to a party or the parties to this Agreement;

(g)     any reference to this Agreement means this Agreement as amended, modified, replaced or supplemented from time to time;

(h)     any reference to a statute, regulation or rule shall be construed to be a reference thereto as the same may from time to time be amended, re-enacted or replaced, and any reference to a statute shall include any regulations or rules made thereunder;

(i)     all dollar amounts refer to Canadian dollars;

(j)     any time period within which a payment is to be made or any other action is to be taken hereunder shall be calculated excluding the day on which the period commences and including the day on which the period ends; and

(k)     whenever any payment is required to be made, action is required to be taken or period of time is to expire on a day other than a Business Day, such payment shall be made, action shall be taken or period shall expire on the next following Business Day.

## 1.3     <u>Accounting Principles</u>

Except as specifically provided otherwise in this Agreement, all calculations referred to herein and all financial statements, projections and reports shall be made or prepared in accordance with generally accepted accounting principles as set out in the CPA Canada Handbook – Accounting Standards for Private Enterprises ("**GAAP**"), as consistently applied by the relevant entity. Such reference will be deemed to be to the generally accepted accounting principles from time to time approved by the Canadian Institute of Chartered Accountants, or any successor institute, applicable as at the date on which such calculation or action is made or taken or required to be made or taken.

## 1.4     <u>Entire Agreement</u>

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether written or oral. There are no conditions, covenants, agreements, representations, warranties or other provisions, express or implied, collateral, statutory or otherwise, relating to the subject matter hereof except as provided herein.

**1.5**        **Time of Essence**

Time shall be of the essence of this Agreement.

**1.6**        **Governing Law and Submission to Jurisdiction**

This Agreement shall be interpreted and enforced in accordance with, and the respective rights and obligations of the parties shall be governed by, the laws of the Province of Ontario and the federal laws of Canada applicable in that province.

Subject to Section 16.7, each of the parties irrevocably and unconditionally (i) submits to the exclusive jurisdiction of the courts of the Province of Ontario over any action or proceeding arising out of or relating to this Agreement, (ii) waives any objection that it might otherwise be entitled to assert to the jurisdiction of such courts and (iii) agrees not to assert that such courts are not a convenient forum for the determination of any such action or proceeding.

**1.7**        **Severability**

If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, all other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

**ARTICLE 2**
**FORMATION AND NAME OF THE PARTNERSHIP**

**2.1**        **Formation**

The General Partner hereby confirms that the Partnership was formed on March 23, 2018 and that the Partnership has filed a Declaration as a limited partnership under the Act, such Declaration has not been withdrawn as of the date hereof and the Partnership continues as a limited partnership under the Act as of the date hereof.

**2.2**        **Name**

The name of the Partnership is "The State Group Holdings Partners LP", or such other name as the General Partner may from time to time deem appropriate to comply with the laws of the jurisdictions in which the Partnership carries on business provided it does not contain the same distinctive part of the name of one of the Limited Partners.

**2.3**        **Declaration of Limited Partnership**

(a)      The General Partner has caused the Declaration to be filed under the Act and shall execute and file such additional documents and filings (including amendments to the Declaration) and take such further action as shall be appropriate or necessary to comply with the laws of the Province of Ontario applicable to limited partnerships.

(b)     The General Partner shall cause to be executed, filed and maintained all certificates, declarations, notices, filings and registrations necessary to maintain the existence of the Partnership as a limited partnership and to qualify the Partnership to carry on business in the Province of Ontario.

**2.4         Purpose of the Limited Partnership**

The Partnership has been formed for the primary purpose of holding the shares of the Canadian Subsidiary and the US Subsidiary, which are carrying on the Business. Subject to Section 9.4(b) and the provisions of the LLC Agreement, the Partnership may also engage in such other activities as the General Partner, acting reasonably and in good faith, considers appropriate and in the best interests of the Partnership in furtherance of, in connection with, or ancillary to the activities of the Partnership set out in this Agreement to achieve the purposes of the Partnership.

**2.5         Nature of the Limited Partnership**

(a)     The Partnership is a limited partnership created only for the purpose specified in Section 2.4, and this Agreement shall not be deemed to create an agreement (in the nature of a limited partnership or any other arrangement) among the Partners with respect to any activities whatsoever other than the activities within the purpose of the Partnership as specified in Section 2.4.

(b)     No Partner shall have any power to bind the Partnership or the other Partners except as specifically provided in this Agreement. None of the Partners nor the Partnership shall be responsible or liable for any Indebtedness or obligation of any other Partner incurred either before or after the execution and delivery of this Agreement, except as to those joint responsibilities, liabilities, Indebtedness or obligations incurred pursuant to, and as limited by, the terms of this Agreement.

**2.6         Principal Place of Business**

The principal place of business of the Partnership shall initially be located at 3206 Orlando Drive, Mississauga, Ontario  L4V 1R5. The General Partner shall be entitled to relocate the principal place of business of the Partnership, provided it shall always be in the Province of Ontario, and shall give all requisite notices, including to the Limited Partners, of any change of the principal place of business of the Partnership. The General Partner shall be responsible for maintaining at the Partnership's principal place of business any records required by the Act and by this Agreement to be maintained there.

**2.7         Fiscal Year**

The first fiscal period of the Partnership shall end on December 31, 2018 and thereafter each fiscal year shall be December 31 or the date of dissolution or other termination of the Partnership, unless changed in accordance with the provisions of Section 9.4(b). Each such fiscal period is herein referred to as a "**Fiscal Year**".

# ARTICLE 3
# REPRESENTATIONS AND WARRANTIES

**3.1**          **Representations and Warranties of the General Partner**

The General Partner hereby represents, warrants, covenants and agrees with each Limited Partner that:

(a)      there are no consents or approvals of governmental authorities or third parties that are required for or in respect of its execution and delivery of this Agreement;

(b)      neither the entering into nor the delivery of this Agreement nor the execution and performance of its obligations and covenants provided or contemplated by this Agreement will conflict with or constitute a default or breach under any of its organizational documents, under any contract or agreement by which it is bound or under any law, rule or regulation to which it is subject;

(c)      no agreement or obligation exists or shall exist that restricts its ability to perform its obligations under this Agreement;

(d)      this Agreement and all related agreements, instruments and documents executed and delivered by it as of the date of this Agreement have been duly authorized, executed and delivered by it and constitute valid and binding obligations of the General Partner enforceable against the General Partner in accordance with its and their terms in all material respects;

(e)      it is a limited liability company existing and in good standing under the laws of the State of Delaware and is and shall continue to be duly authorized and qualified to do all things required of it under this Agreement and any agreement executed in connection with the transactions herein contemplated;

(f)      it is not now, and shall not, for so long as it is the General Partner, carry on any business other than acting as the General Partner; and

(g)      it is qualified to do business in the Province of Ontario and agrees to maintain its existence and status in the Province of Ontario so long as it remains the General Partner and agrees to obtain and maintain all necessary registrations in other provinces of Canada where it holds title or leases to property or carries on business.

**3.2**          **Representations and Warranties of the Limited Partners**

Each of the Limited Partners hereby represents, warrants, covenants and agrees with each other Partner that:

(a)      there are no consents or approvals of governmental authorities or third parties that are required for the execution and delivery of this Agreement other than those, if any, that have been obtained;

(b)      neither the entering into nor the delivery of this Agreement nor the execution and performance of its obligations and covenants provided or contemplated by this

Agreement will conflict with or constitute a default or breach under any of its organizational documents, under any contract or agreement by which it is bound or under any law, rule or regulation to which it is subject;

(c)     no agreement or obligation exists that restricts its ability to perform its obligations under this Agreement;

(d)     there is no litigation, action or proceeding to which it is party that if adversely determined could have an adverse effect on, or enjoin, restrict or otherwise prevent, the consummation of any of the transactions contemplated by this Agreement or its ability to perform its obligations under this Agreement;

(e)     this Agreement and all related agreements, instruments and documents to be executed and delivered by it as of the date of this Agreement have been duly authorized, executed and delivered by it and constitute valid and binding obligations of such Limited Partner enforceable against such Limited Partner in accordance with its and their terms in all material respects;

(f)     if an individual, he or she has obtained the age of majority and has the legal capacity and competence to enter into this Agreement and to take all actions required pursuant thereto and hereto;

(g)     if a corporation or body corporate or a partnership, it is existing and in good standing under the laws of its jurisdiction of incorporation or formation, as applicable, and is duly authorized and qualified to do all things required of it under this Agreement and any agreement executed in connection with the transactions herein contemplated; and

(h)     it has been afforded the full opportunity to review this Agreement and is solely responsible for obtaining such tax, investment, legal and other professional advice as it considers appropriate in connection with the execution, delivery and performance by it of this Agreement and the transactions contemplated hereunder.

**3.3**     **Survival of Representations, Warranties and Covenants**

The representations, warranties and covenants made pursuant to Sections 3.1 and 3.2 shall survive the execution and delivery of this Agreement and each Partner covenants and agrees to ensure that each representation, warranty and covenant made by it pursuant to Section 3.1 or Section 3.2, as the case may be, remains true as long as it remains a Partner.

**ARTICLE 4**
**UNITS AND CAPITAL CONTRIBUTIONS**

**4.1**     **Units and General Partner Interest**

(a)     The interests of the Limited Partners in the Partnership shall be divided into and represented by Units, of which an unlimited number of Class A Units are authorized to be issued in accordance with this Agreement. Each Unit shall represent an equity interest in the Partnership having the attributes set out in this Agreement. The Capital Contribution of each

Limited Partner in respect of its Units shall be recorded in the books of the Partnership in accordance with Section 7.1.

(b)　　　The General Partner shall have an interest in the Partnership (the "**General Partner Interest**") in accordance with the terms and conditions expressly provided for in this Agreement and has contributed $1 for such interest in the Partnership.

## 4.2　　　<u>Equality of Limited Partners</u>

Except as otherwise specifically provided in this Agreement, the holder of each Unit shall have the same rights and obligations as the holder of any other Unit.

## 4.3　　　<u>Creation of Additional Units</u>

(a)　　　Subject to the limitations set forth in this Section 4.3 and Section 13.1, upon the approval of the General Partner, the Partnership may permit any existing Partner or other person to make additional Capital Contributions to the Partnership, or create and issue any Units of an existing class or series, or such additional classes or series of Units, having such designations, preferences, relative participating or other special rights, powers and duties, as the General Partner shall determine, including, without limitation:

(i)　　　the right of any such class or series of Units to share in Partnership distributions;

(ii)　　　the allocation to any such class or series of Units of items of Partnership income, gains, losses and deductions; and

(iii)　　　the rights of any such class or series of Units upon dissolution or liquidation of the Partnership.

(b)　　　The Partners understand and agree that rights afforded to any additional classes or series of Units (including, without limitation, rights to distributions and liquidation proceeds) may result in a corresponding reduction in the rights of the other Partners.

(c)　　　Upon the issuance pursuant to this Section 4.3 of any class or series of Units or the making of additional Capital Contributions, (i) the Capital Accounts of each Partner shall be updated accordingly, and (ii) the General Partner may (without the approval of any Partner, but subject to Section 16.2) amend any provision of this Agreement, and authorize any person to execute, swear to, acknowledge, deliver, file and record, if required, such documents, to the extent necessary or desirable to reflect the admission of any additional Partner to the Partnership or the authorization and issuance of such class or series of Units and the related rights and preferences thereof.

(d)　　　No Units may be issued by the Partnership at less than Fair Market Value.

## 4.4　　　<u>Register</u>

The Partnership shall maintain a register to record the names and addresses of the Partners, the number of Units held by each Limited Partner and particulars of registration and assignment of Units (the "**Register**").

**4.5**     __No Fractional Units__

A Unit may not be divided or split into fractions and the Partnership shall not accept any subscription for, record any assignment of, or otherwise recognize any interest in less than a whole Unit.

**4.6**     __No Distribution to the Public__

Notwithstanding any provisions hereof to the contrary, any distribution of securities to the public or invitation to the public to subscribe for Units is prohibited.

**4.7**     __Initial Capital Contributions__

The Partners hereby acknowledge and confirm that each of BWF LP, YPF LP, the US Management Holders and Employeeco has subscribed for the following Units and has paid the following amounts as a contribution to the capital of the Partnership in full satisfaction of the subscription price therefor and such Capital Contribution shall be credited to such Limited Partner's Capital Account:

| Limited Partner | No. of Class A Units | Capital Contribution |
|---|---|---|
| BWF LP | 35,942,510 | $35,942,510 |
| YPF LP | 14,000,000 | $14,000,000 |
| EmployeeCo | 2,282,000 | $2,282,000 |
| LJ | 200,000 | $200,000 |
| ST | 500,000 | $500,000 |
| TK | 200,000 | $200,000 |
| SW | 15,000 | $15,000 |
| JS | 386,610 | $386,610 |

**4.8**     __Additional Capital Contributions__

No Partner shall be required to lend any funds to the Partnership or make any additional Capital Contributions.

**4.9**     __Admission of Additional Limited Partners__

Subject to the limitations set forth in this Section 4.9 and, upon the approval of the General Partner, the Partnership may admit additional Limited Partners to the Partnership. No additional Limited Partner shall be admitted to the Partnership pursuant to this Section 4.9 unless and until the applicable conditions of Article 11 have been satisfied (with such conditions being interpreted as applying to the admission of an additional Limited Partner rather than to a Transfer) or waived by the General Partner, and such prospective additional Limited Partner has executed a counterpart of this Agreement. Each Partner hereby consents to the admission to the Partnership of any additional Limited Partner in accordance with the provisions of this Section 4.9 and to the issuance to any such person of Units.

**ARTICLE 5**
**ALLOCATION OF INCOME AND LOSSES**

**5.1          Allocations of Income and Losses**

(a)      The Net Income and Taxable Income of the Partnership for a Fiscal Year shall each be allocated at the end of such Fiscal Year as follows:

(i)      to the General Partner, an amount equal to 0.0001% of the Net Income or Taxable Income of the Partnership for such Fiscal Year; and

(ii)     the balance to the Limited Partners, in accordance with Section 8.4.

(b)      The Net Loss and Taxable Loss of the Partnership for a Fiscal Year shall each be allocated at the end of such Fiscal Year as follows:

(i)      to the General Partner, an amount equal to 0.0001% of the Net Loss or Taxable Loss of the Partnership for such Fiscal Year; and

(ii)     the balance to the Limited Partners, in accordance with Section 8.4.

**5.2          Tax Allocations**

(a)      For purposes of determining the Taxable Income and Taxable Loss of the Partnership, the Partnership shall claim discretionary deductions or allowances to the maximum extent possible, unless the General Partner determines otherwise.

(b)      Each Partner shall prepare, or cause to be prepared, and file such documents as may be required to be prepared and filed by it for purposes of the Tax Act in respect of its allocation of Taxable Income or Taxable Loss and shall include in its computation of the income or loss of the Partnership for tax purposes the amounts determined and allocated to it pursuant to this Agreement.

**5.3          Limited Liability of Limited Partners**

Notwithstanding any other provisions of this Agreement: (a) subject to the provisions of the Act, in no event shall any Limited Partner be liable, whether to the other Partners or any other person, to pay for any loss of the Partnership or be personally liable, whether to the other Partners or any other person, for any debts, liabilities, losses or obligations of the Partnership except to the extent of its Capital Contributions to the Partnership and its share of any undistributed income of the Partnership; (b) subject to the provisions of the Act, each Limited Partner shall have no further or additional liability for debts, liabilities, losses or obligations of the Partnership; and (c) no Limited Partner shall be responsible for any losses of any other Partner, nor share in the income or, if applicable, allocation of tax deductible expenses attributable to any other Partner, with respect to such other Partner's Capital Account.

**5.4          No Partition**

Each Partner hereby waives its rights to partition the assets of the Partnership.

**5.5**      <u>Withdrawal</u>

         Subject to Article 12, no Limited Partner may withdraw as a limited partner of the Partnership without the consent of the General Partner, nor shall any Limited Partner be required to withdraw from the Partnership. Upon any resignation or withdrawal, such Partner shall surrender its Units and shall have no further rights as a Partner. A resigning or withdrawing Partner shall not be entitled to receive any distribution and shall not otherwise be entitled to receive the Fair Market Value or any other payment in respect of its Units.

**ARTICLE 6**
**REIMBURSEMENT OF GENERAL PARTNER**

**6.1**      <u>Expenses Only</u>

         The General Partner shall receive no compensation for its services to the Partnership but the Partnership shall reimburse the General Partner for all of its reasonable out-of-pocket expenses incurred in performing its obligations under this Agreement, including the cost of preparing audited financial statements and tax returns pursuant to this Agreement.

**ARTICLE 7**
**CAPITAL ACCOUNTS AND ADDITIONAL CONTRIBUTIONS**

**7.1**      <u>Capital Accounts</u>

     (a)      The Partnership shall establish and maintain a separate capital account ("**Capital Account**") for each Partner.

     (b)      Each Partner's Capital Account shall be increased by:

         (i)      the amount of the Capital Contributions made by such Partner to the Partnership; and

         (ii)      the amount of Net Income and items of income or gain allocated to such Partner pursuant to this Agreement.

     (c)      Each Partner's Capital Account shall be decreased by:

         (i)      the amount of Net Loss and items of loss or deduction allocated to such Partner pursuant to this Agreement; and

         (ii)      all amounts paid or distributed to such Partner pursuant to this Agreement as a distribution or as a return of capital.

**7.2**      <u>No Right to Withdraw Capital</u>

     (a)      No Partner shall have the right to receive any distributions or otherwise to withdraw any positive balance in its Capital Account except as expressly provided in this Agreement or as may be Approved by the General Partner. Notwithstanding the foregoing, BWF LP may not withdraw any positive balance in its Capital Account except as expressly provided in this Agreement or as may be approved by the holders of 90% of the Units.

(b)      In the event of a Transfer of a Limited Partner's Units in the Partnership, the Capital Account of the Transferor shall become the Capital Account of the Substitute Limited Partner to the extent it is attributable to the transferred Units.

(c)      Except as otherwise required in the Act, no Limited Partner shall have any liability to restore all or any portion of a deficit balance in such Limited Partner's Capital Account.

## 7.3      No Interest

No interest shall be paid by the Partnership on any capital contributed to the Partnership or on any amount in a Capital Account. No Partner shall be liable to pay interest on any negative balance of capital in its Capital Account.

## 7.4      Negative or Zero Balance in Capital Account

The Interest of a Partner shall not terminate by reason of there being a negative or zero balance in the Partner's Capital Account.

## 7.5      Payment of Contribution and Advances of Loans

All Capital Contributions and all loans made by the Limited Partners to the Partnership shall be in Canadian dollars and may be made by bank draft or certified cheque made payable to the Partnership, by electronic wire transfer of immediately available funds to the bank account of the Partnership or to such person and in such manner as may be otherwise directed by the General Partner, acting reasonably.

## ARTICLE 8
## DISTRIBUTIONS

## 8.1      Timing and Amount of Distributions

Subject to Section 8.2 and Section 10.2, the General Partner shall cause the Canadian Subsidiary and the US Subsidiary to adopt a policy in respect of the payment of dividends in proportion to their respective EBITDA amounts; provided that the board of directors of each of the Canadian Subsidiary and the US Subsidiary shall be entitled to (i) pay dividends in an amount that is not proportionate to the respective EBITDA of the US Subsidiary and the Canadian Subsidiary, or (ii) refrain from paying dividends, if such action is, in the discretion of the board of directors of the Canadian Subsidiary or the US Subsidiary, reasonably necessary to fund costs or expenses of the Canadian Subsidiary or the US Subsidiary, as applicable.  To the extent that any tax reduces the amount of such dividends received by the Partnership, any distributions made by the Partnership to those Partners in respect of whom such tax is payable shall be reduced by each Partner's proportionate share of such taxes. The General Partner shall periodically review any reserves created and may in its discretion increase such reserves or release any excess amounts in such reserves for distribution in accordance with this Article 8.

## 8.2      Tax Distributions

The Partnership will make a cash distribution (a "**Tax Distribution**"), at such times as determined by the General Partner, but in no event later than 15 days prior to the due date of a Partner's tax return, to each Partner in an amount that, when combined with all other

amounts previously distributed to such Partner with respect to a Fiscal Year pursuant to this Section 8.2 (other than Tax Distributions in respect of a prior Fiscal Year), is equal to 54% (or such other percentage as determined by the General Partner) of the net Taxable Income allocated (or estimated to be allocated) by the Partnership to such Partner in respect of such Fiscal Year, taking into account Taxable Loss to the extent determined by the General Partner; provided, however, that if aggregate Tax Distributions made to a Partner in respect of any Fiscal Year exceed the Tax Distribution that would have been made to such Partner in respect of such Fiscal Year if all Tax Distributions in respect of such Fiscal Year had been made at the end of such Fiscal Year, then such Partner shall promptly remit such excess in cash to the Partnership and the amount so remitted shall be treated as never having been distributed to such Partner. Tax Distributions made to a Partner shall not be creditable against (and shall not reduce) future distributions pursuant to Section 8.4. If applicable in the future, this Section 8.2 shall be applied to a Partner holding more than one class of Units separately based on allocations and distributions to such Partner in respect of each class of such Partner's Units, and, if a Partner holds Units of the same class but such Units are subject to terms or conditions that are different than other Units of the same class held by such Partner, then the General Partner is authorized to treat such Partner as if each set of Units having different terms or conditions were a different class of Units.

## 8.3       <u>Distributions in Kind</u>

The Partnership may, in the discretion of the General Partner, make distributions of securities or other assets. Each distribution of securities or other assets will be made in accordance with Section 8.4 as if there had been a sale of such securities or assets by the Partnership for an amount of cash equal to the Fair Market Value of such securities or assets as of a date reasonably selected by the General Partner, followed by an immediate distribution of such cash proceeds in accordance with Section 8.4.

## 8.4       <u>Amount and Priority of Distributions</u>

Subject to Section 8.5, the General Partner shall, in its discretion, make distributions from Distributable Cash from time to time in the following manner:

(a)       first, to the General Partner, in an amount equal to 0.0001% of the aggregate Distributable Cash to be distributed by the Partnership;

(b)       second, after the distribution of the amount referenced in Section 8.4(a), to the Limited Partners holding Class A Units, in proportion to their respective number of Units owned beneficially or of record by such Limited Partner, until the amount of Distributable Cash to be distributed pursuant to this Section 8.4(b) in respect of each Unit as of such time provides each such Limited Partner with a Preferred Return on each such Limited Partner's Invested Capital in respect of such Units as of such time;

(c)       third, after the distribution of all amounts referenced in Section 8.4(a) and Section 8.4(b), to the Limited Partners holding Class A Units, in proportion to their respective number of Units owned beneficially or of record by such Limited Partner, until the amount of Distributable Cash to be distributed pursuant to this Section 8.4(c) in respect of each such Unit as of such time equals the Invested Capital in respect of such Units as of such time; and

(d)     thereafter, after the distribution of all amounts referenced in Section 8.4(a), Section 8.4(b) and Section 8.4(c), to the Limited Partners, in proportion to their respective number of Units.

**8.5     Limitations on Distributions**

(a)     Notwithstanding anything to the contrary in Section 8.4, no distributions of Distributable Cash will be made in the event (i) the Partnership or the General Partner is insolvent or the making of all or part of such distribution would result in the Partnership or the General Partner being insolvent, or (ii) such distribution would be in contravention of or would result in the Partnership or the General Partner being in breach of the terms of any loan or third-party credit facility.

(b)     Notwithstanding anything to the contrary in Section 8.4, all distributions to the Partners pursuant to Section 8.4(d) shall take into consideration and be net of any bonus compensation obligations of the Partnership or any of its subsidiaries under any Phantom Unit Plan unless already deducted in the calculation of Distributable Cash.  Any calculations regarding the bonus compensation obligations of the Partnership or any of its subsidiaries under any Phantom Unit Plan shall be made by the General Partner in good faith.

**8.6     Payments of Distributions**

All payments to be made to each Partner from time to time pursuant to this Article 8 shall be made in Canadian currency by bank draft or wire transfer of immediately available funds in accordance with such direction as may be provided from time to time by such Partner to the General Partner.

**ARTICLE 9
CONTROL AND MANAGEMENT**

**9.1     Management by General Partner: Powers of the General Partner**

(a)     Subject to the provisions of this Agreement and any applicable limitations set out in the Act and the LLC Agreement, the General Partner has the full and exclusive right, power and authority to manage, control, administer and operate the Partnership and the business and affairs of the Partnership and to do any act, take any proceedings, make any decision and execute and deliver any instrument, deed, agreement or document for and on behalf of, and in the name of, the Partnership. The General Partner may also hold title to any real property as bare trustee and/or nominee for the Partnership, if the Partnership so requires.

(b)     Without limiting the generality of the foregoing, the General Partner has the power and authority to deal with any assets of the Partnership, lease any portion of the assets of the Partnership, borrow money and, as security therefor, encumber the assets of the Partnership, provided that any such actions are not inconsistent with the provisions of the LLC Agreement.

(c)     Subject to the terms of this Article 9, the General Partner shall possess and shall enjoy and exercise all of the rights and powers of a general partner as provided in the Act including the right and authority:

(i)      to bind the Partnership within the scope of the purpose set forth in Section 2.4;

(ii)     to execute and deliver any and all documents, contracts and agreements on behalf of the Partnership;

(iii)    to manage the business and affairs of the Partnership and for this purpose to employ, retain or appoint, at the Partnership's reasonable expense, any officers, employees, consultants, agents, brokers, professionals or other persons in any capacity, including solicitors and accountants, in each case for such compensation and on such terms as the General Partner deems necessary or desirable and to rely on the advice of such persons;

(iv)    to enter into, execute, deliver, acknowledge, make, modify, supplement or amend any documents or instruments in the name and on behalf of the Partnership which the General Partner deems necessary or appropriate to achieve the purposes of the Partnership, including contracts, agreements, leases, subleases, easements, deeds, notes, mortgages, and other documents or instruments of any kind or character or amendments of any such documents or instruments;

(v)     to procure and maintain with responsible companies, in the name, on behalf of, and at the expense of, the Partnership, such amounts and types of insurance in respect of the Partnership as it deems appropriate;

(vi)    to procure and maintain with responsible companies, at the expense of the Partnership, insurance policies insuring the General Partner against liability arising as a result of any action it may take or fail to take in its capacity as General Partner of the Partnership;

(vii)   to appoint and replace the Auditor;

(viii)  to enter into any agreement regarding a Drag-Along Sale, merger, consolidation or other transaction involving the Partnership or any of its subsidiaries or any of their assets;

(ix)    to enter into any agreement in respect of Indebtedness, to perform or cause to be performed all of the Partnership's obligations in respect of its Indebtedness and any encumbrance securing such Indebtedness;

(x)     subject to Section 5.2, to make elections and prepare and file returns regarding tax obligations imposed by any governmental authority, with power to manage and represent the Partnership in any administrative proceeding before any governmental authority;

(xi)    to secure any governmental approvals;

(xii)   to deal in and with the assets of the Partnership, and act on behalf of the Partnership as its representative in respect of all matters relating to the assets of the Partnership;

(xiii)   to bring, defend, compromise, collect, pay, adjust, arbitrate or otherwise take any action and exercise any remedies with respect to any receivable held by or claim available to or against the Partnership;

(xiv)   to pay Partnership expenses incurred in the administration and operation of the Business;

(xv)   to open and manage bank accounts in the name of the Partnership and spend the capital of the Partnership in the exercise of any right or power exercisable by the General Partner hereunder;

(xvi)   to borrow funds in the name of the Partnership from time to time from such financial institutions as the General Partner may determine;

(xvii)   to mortgage, charge, assign, hypothecate, pledge or otherwise create a security interest in all or any of the assets of the Partnership now owned or hereafter acquired, to secure any present and future borrowing or guarantee and related expenses of the Partnership;

(xviii)   to incur all costs and expenses in connection with the Partnership;

(xix)   to prudently invest cash assets of the Partnership that are not immediately required for the Business of the Partnership in short-term investments;

(xx)   to do anything that is in furtherance of or incidental to the Business of the Partnership or that is provided for in this Agreement;

(xxi)   to take any other action permitted or required of the General Partner pursuant to this Agreement or under applicable law; and

(xxii)   generally to carry out the objects, purpose and Business of the Partnership.

(d)   Unless otherwise provided in this Agreement, any action taken by the General Partner, and the signature of the General Partner on any agreement, contract, instrument or other document on behalf of the Partnership, shall be sufficient to bind the Partnership and shall conclusively evidence the authority of the General Partner and the Partnership with respect thereto.

(e)   The General Partner shall keep the other Partners informed as to all material matters concerning the Partnership.

(f)   The rights of the General Partner, as General Partner, may not be assigned voluntarily or by operation of law by the General Partner, and the duties of the General Partner, as General Partner, may not be delegated voluntarily or otherwise by the General Partner, except as expressly permitted by this Agreement.

(g)   The General Partner may, in its sole discretion, resign as General Partner without the prior written Consent of any of the other Partners. Any such resignation by the General Partner shall be effective immediately following admission of a successor General

Partner to the Partnership by the approval of the holders of 50% of the Units, which shall include Units held by YPF LP. The resigning General Partner shall comply with its obligations in Section 9.12.

(h)  Each Limited Partner hereby irrevocably nominates, constitutes and appoints the General Partner, with full power of substitution, as the Limited Partner's agent and true and lawful attorney to act on the Limited Partner's behalf with full power and authority in the Limited Partner's name, place and stead to execute and record or file as and where required:

(i)  this Agreement, any amendment to this Agreement and any other instruments or documents required to continue and keep in good standing the Partnership as a limited partnership under the Act, or otherwise to comply with the laws of any jurisdiction in which the Partnership may carry on business or own or lease property in order to maintain the limited liability of the Limited Partners and to comply with the applicable laws of that jurisdiction (including any amendments to the Declaration);

(ii)  all instruments and any amendment to the Declaration necessary to reflect any amendments to this Agreement;

(iii)  any instrument required in connection with the dissolution and termination of the Partnership in accordance with the provisions of this Agreement, including any elections under the Tax Act and under any similar legislation;

(iv)  the documents necessary to be filed with the appropriate governmental body or authority in connection with the business, property, assets and undertaking of the Partnership;

(v)  all documents necessary to give effect to the Business of the Partnership;

(vi)  any election, determination, designation, information and return or similar document or instrument as may be required or desirable at any time under the Tax Act or under any other taxation legislation or law of like import in Canada or any province or jurisdiction which relates to the affairs of the Partnership or the interest of any person in the Partnership; and

(vii)  for the US Management Holders and Employeeco only, all other instruments and documents on the Limited Partner's behalf and in the Limited Partner's name or in the name of the Partnership as may be deemed necessary by the General Partner to carry out fully this Agreement in accordance with its terms.

The power of attorney granted herein is irrevocable and is a power coupled with an interest and shall not be terminated by the Incapacity of the Limited Partner or otherwise by the operation of law and extends to the heirs, executors, administrators, successors, assigns and other legal representatives of the Limited Partner, and shall survive the subsequent Incapacity of such transferee and may be exercised by the General Partner on behalf of the transferee in executing such instrument with a single signature as attorney and agent for the Limited Partner. The Limited Partner agrees to be bound by any representation or action made or taken by the

General Partner pursuant to such power of attorney and hereby waives any and all defences which may be available to contest, negate or disaffirm the action of the General Partner taken in good faith under such power of attorney.

**9.2          Standard of Care**

The General Partner covenants that it will perform its obligations, exercise its power and discharge its duties under this Agreement honestly, in good faith and in the best interests of the Partnership.

**9.3          Other Matters Concerning the General Partner**

(a)          The General Partner may rely on, and shall be protected in acting on, any resolution, certificates, statements, instrument, opinion, report, notice, request, consent, order, bond, debenture or other paper or document believed by it to be genuine and to have been signed and presented by the proper party or parties.

(b)          The General Partner may consult with legal counsel, accountants, appraisers, management consultants and other consultants and advisors selected by it and any act taken or omitted to be taken in reliance upon the opinion (including, an opinion of counsel) of such persons as to matters that the General Partner reasonably believes to be within such person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith and in accordance with such opinion.

**9.4          Restrictions on General Partner**

(a)          The General Partner shall not:

(i)          commingle the funds of the Partnership with the funds of the General Partner or any of its Affiliates or with the funds of any other person;

(ii)          dissolve the affairs of the Partnership except in accordance with the provisions of Article 10;

(iii)          possess any assets of the Partnership or assign the rights of the Partnership in specific assets of the Partnership, for other than a Partnership purpose;

(iv)          perform any act that would subject any Limited Partner in its capacity as such to liability as a general partner or to incur any liability or obligation not expressly provided for in this Agreement; or

(v)          admit a person or entity as a Partner, except as provided in this Agreement.

(b)          Notwithstanding any other provisions of this Agreement, the General Partner shall not be permitted to take any of the following actions, or cause the Partnership or any of its subsidiaries to take any of the following actions, without first obtaining the approval of the Limited Partners holding in the aggregate over 90% of the outstanding Units:

(i)      dissolve the Partnership, except as otherwise provided for under Article 10;

(ii)     permit the withdrawal of capital by BWF LP or its Permitted Transferees; provided, for greater certainty, that this Section 9.4(b)(ii), shall not apply to any distributions of the Partnership made pursuant to this Agreement;

(iii)    replace the General Partner under Section 9.1(g);

(iv)     remove the General Partner and elect a new General Partner as provided for under Section 9.12;

(v)      waive any default on the part of the General Partner;

(vi)     change the Fiscal Year; or

(vii)    other than an Exempted Matter, pay any amounts to or on behalf of BWF LP or any Related Party to BWF LP, or enter into any agreement, contract or other document committing to make any such payment not expressly contemplated by this Agreement or the Management Services Agreement, or enter into any agreement, contract or other document or transaction with BWF LP or any Related Party to BWF LP.

(c)      The General Partner shall not be permitted to undertake any strategic transaction where the Business carried on by the Partnership and its subsidiaries following such transaction:

(i)      would not earn the majority of its consolidated revenues, as determined on an annual basis, from the provision of construction and maintenance services to industrial customers; or

(ii)     would earn greater than 25% of its consolidated revenues, as determined on an annual basis, from countries other than Canada and USA,

without first obtaining the approval of YPF LP, if such transaction and any related transactions would result in YPF LP collectively with its Affiliates owning 15% or less of the Units on a fully diluted basis.

**9.5      <u>Restrictions on Limited Partners</u>**

No Limited Partner, in its capacity as a limited partner, shall:

(a)      take part in the management or control of the Business of the Partnership or transact any business for the Partnership;

(b)      execute any document which binds or purports to bind the Partnership or any Partner;

(c)      hold itself out as having the power or authority to bind the Partnership or any Partner;

(d)      undertake any obligation or responsibility on behalf of the Partnership; or

(e) bring any action for partition or sale in connection with any assets of the Partnership, whether real or personal.

The Limited Partners shall not change the Partnership into a general partnership or change the limited liability provisions of the Partnership.

**9.6** **General Partner Indemnity**

The General Partner hereby indemnifies and holds harmless the Partnership and each Limited Partner from and against all costs, expenses, damages or liabilities suffered or incurred by the Partnership or such Limited Partners by reason of any act of fraud, wilful misconduct or negligence by the General Partner or of any act not within the scope of the authority conferred on the General Partner by this Agreement.

**9.7** **Books and Records**

The General Partner shall keep or cause to be kept at the principal place of business of the Partnership appropriate books and records with respect to the Partnership's Business, which books and records may be kept on, or be in the form of, computer disk, hard disk, magnetic tape, or any other information storage device, provided that they are convertible into clearly legible written form within a reasonable period of time. The books of the Partnership shall be maintained for financial reporting purposes on an accrual basis in accordance with GAAP. The foregoing books and records shall be maintained by the General Partner after the dissolution of the Partnership for the time periods required by the laws of Canada.

**9.8** **Income Tax Information**

The General Partner will send or cause to be sent to each person who was a Limited Partner during the previous Fiscal Year, or at the date of dissolution of the Partnership, within 90 days of the end of such Fiscal Year or within 60 days of dissolution, as the case may be, or within such other shorter period of time as may be required by applicable law, all information, in suitable form, relating to the Partnership necessary for such person to prepare such person's Canadian tax returns, provided that all financial information provided by the General Partner shall be prepared in accordance with GAAP, and such other information and documents as are reasonably requested by such person to make appropriate tax filings with respect to that Fiscal Year. The General Partner shall file, on behalf of the General Partner and the Limited Partners, any information return required to be filed in respect of the activities of the Partnership under the Tax Act, or any other taxation or other legislation or laws of like import of Canada or of any applicable province or jurisdiction, including with respect to any withholding taxes, but shall not be required to prepare or file on behalf of any Partner any tax returns required by any jurisdiction outside Canada.

**9.9** **FATCA**

Each Limited Partner agrees to provide to the General Partner on a timely basis such information regarding such Limited Partner or the direct or indirect beneficial holders thereof as the General Partner determines is reasonably required in order for the Partnership, the General Partner or any member of any "expanded affiliated group" (as defined in Section 1471(e)(2) of the Code) to which the General Partner or the Partnership belongs to comply with *The Foreign Account Tax Compliance Act* ("**FATCA**").  Any Limited Partner that fails to comply with this Section 9.9 shall, together with all other Limited Partners that fail to comply with this

Section 9.9, indemnify and hold harmless the General Partner and the Partnership for any costs or expenses arising out of such failure or failures, including any withholding tax imposed under FATCA.

**9.10** <u>**Access to Information**</u>

(a)     Each Limited Partner shall have access to all books and records of, and information concerning, the General Partner, the Partnership and the assets of the Partnership. The General Partner shall, upon reasonable prior written request, allow a Limited Partner, its representatives, auditors and advisors, to have access, during normal business hours at the principal office of the General Partner and the Partnership, to all books and records and information concerning the General Partner, the Partnership and the assets of the Partnership.

(b)     Each Limited Partner shall be permitted to review or cause auditors or representatives engaged by it to review any financial statements prepared in respect of the Partnership, the General Partner and the assets of the Partnership and all books and records and working papers related thereto.

(c)     Upon the request of a Limited Partner made to the General Partner, representatives and advisors of such Limited Partner shall be provided with an opportunity to meet, during normal business hours, with the Auditor and other persons who are familiar with the affairs of the General Partner, the Partnership and the assets of the Partnership.

(d)     A Limited Partner shall bear its own costs for the access, and any audit or review, referred to in this Section 9.10, including any costs associated with making photocopies of documents.

**9.11** <u>**Reports**</u>

In addition to any information that the General Partner or the Partnership is required, by applicable law, to deliver to the Limited Partners, the General Partner shall provide each Limited Partner with the financial statements and reports required to be delivered to the board of managers of the General Partner pursuant to the LLC Agreement.

**9.12** <u>**Removal of General Partner**</u>

(a)     The General Partner may not be removed as general partner of the Partnership unless such removal has been approved by the Limited Partners holding in the aggregate over 50% of the outstanding Units, in which case the General Partner shall cease to be qualified to act as General Partner hereunder and shall be deemed to have resigned as General Partner of the Partnership effective upon the appointment of a new General Partner by the Limited Partners. The removal of the General Partner shall be effective immediately following admission of a new General Partner to the Partnership.

(b)     On the admission of a new general partner to the Partnership, the General Partner that was removed or resigned will do all things and take all steps to transfer the administration, management, control and operation of the business of the Partnership and the books, records and accounts of the Partnership to the new General Partner and will execute and deliver all deeds, certificates, declarations and other documents necessary or desirable to effect such transfer.

(c)    Upon the resignation or removal of the General Partner, the Partnership shall release and hold harmless the General Partner then resigning or being removed from all claims, actions, costs, demands, losses, damages and expenses with respect to events which occur in relation to the Partnership after the effective date of such removal or resignation.

(d)    A new General Partner accepted hereunder will become a party to this Agreement by executing a counterpart hereof and thereupon shall be bound by all of the provisions hereof and assume the obligations, duties and liabilities of the General Partner hereunder as and from the date the new General Partner becomes a party to this Agreement and shall thereupon make all necessary filings in connection with its appointment. The new General Partner shall not be a "non-resident" of Canada within the meaning of the Tax Act.

(e)    The General Partner will take all action necessary to transfer and assign the General Partner Interest for nominal consideration to the new General Partner.

## ARTICLE 10
## DURATION

**10.1    Termination Events**

The Partnership shall continue until the earliest to occur of:

(a)    the approval of the Limited Partners holding in the aggregate over 90% of the outstanding Units to terminate the Partnership;

(b)    the sale, transfer or other disposition of all or substantially all of the assets of the Partnership; or

(c)    the happening of any of the events set forth in section 21 of the Act which affects the General Partner and thereby results in the dissolution of the Partnership by operation of law, unless within 90 days after such occurrence all remaining Partners unanimously elect to continue the business of the Partnership and appoint a new General Partner.

**10.2    Liquidation**

(a)    Upon the occurrence of an event specified in Section 10.1, and in the absence of an election to continue the business of the Partnership pursuant to Section 10.1(c), the Partnership shall be dissolved and the General Partner – or if an event stated in Section 10.1(c) has occurred with respect to the General Partner, the Limited Partners – (the General Partner or the Limited Partners, as the case may be, being referred to as the "**Liquidating Partner**") shall proceed to wind up and terminate the business of the Partnership. The Liquidating Partner shall cause a full accounting of the assets of the Partnership and liabilities of the Partnership to be taken and shall cause the assets of the Partnership to be liquidated and the business to be wound up as promptly as possible by selling the assets of the Partnership and distributing, subject to the terms of this Agreement, the net proceeds therefrom (after the payment of the Partnership's liabilities) to each Partner.

(b)    The proceeds of liquidation shall be applied in the following order of priority:

(i)    first, to the expenses of such liquidation;

(ii)     second, to the debts and liabilities of the Partnership to any person other than the Limited Partners, if any, in the order of priority provided by law, including any withholding or other tax obligations of the Partnership;

(iii)    third, a reasonable reserve (determined in good faith by the Liquidating Partner with the Approval of the General Partner) shall be set up to provide for any contingent or unforeseen liabilities or obligations of the Partnership (to be held and disbursed, in the reasonable discretion of the Liquidating Partner, by an escrow agent selected by the Liquidating Partner with the Approval of the General Partner) and at the expiration of such period as the Liquidating Partner may reasonably deem advisable (with the Approval of the General Partner), the balance remaining in such reserve shall be distributed as provided herein; and

(iv)    fourth, to the Partners in accordance with Section 8.4.

(c)     The Partners shall continue to share profits, losses, gain or loss on sale or disposition during the period of liquidation in the same manner and proportion, as specified in Article 8 hereof, as though the Partnership had not dissolved. The Liquidating Partner shall have full right and unlimited discretion to determine in good faith the time, manner and terms of any sale or sales of assets of the Partnership pursuant to such liquidation, having due regard to the activity and condition of the relevant market and general financial and economic conditions.

## 10.3      <u>Termination</u>

The Partnership shall terminate when all or substantially all of the assets of the Partnership, after payment of or due provision established for all debts, liabilities, expenses and other obligations of the Partnership, shall have been distributed to the Partners in the manner provided for in this Article 10, and the Declaration shall have been cancelled in the manner required by the Act.

## 10.4      <u>Rights and Obligations of Partners during Winding-Up Period</u>

During the period of the winding-up of the affairs of the Partnership, the rights and obligations of the Partners set forth in this Agreement with respect to the Partnership shall continue.

## 10.5      <u>General Partner Corporate Existence</u>

The General Partner shall maintain its existence as a legal entity throughout the term of this Agreement.

## 10.6      <u>Continuation of Partnership</u>

Subject to the provisions of Section 10.1(c), the Partnership shall not be dissolved or terminated by the addition, resignation, removal, bankruptcy, insolvency or receivership of any Partner or by the dissolution, liquidation or winding-up of any Partner, or by the death of any Partner.

## ARTICLE 11
## TRANSFER OF INTERESTS

**11.1**        **General Prohibition on Transfer**

Except as otherwise specifically provided in this Agreement, no Partner shall Transfer any of its right, title or interest in and to any Interest or Units now or hereafter owned of record or beneficially by such Partner.

**11.2**        **Transfer of General Partner Interest**

The General Partner shall not Transfer the General Partner Interest unless such Transfer, and the Transferee or replacement general partner, is approved by the Limited Partners holding in the aggregate over 50% of the outstanding Units, which shall include Units held by YPF LP; provided that the General Partner may at any time and from time to time Transfer all or any portion of its General Partner Interest to an Affiliate without complying with this Section 11.2.  Any Transferee of the General Partner Interest or replacement General Partner shall not be admitted to the Partnership unless the conditions to Transfer applicable to Units set out in Section 11.4(a) are satisfied with respect to such Transferee or replacement General Partner, *mutatis mutandis*.

**11.3**        **Encumbrance of General Partner Interest**

The General Partner shall not grant an Encumbrance over the General Partner Interest unless expressly permitted by this Agreement.

**11.4**        **Transfer of Units**

(a)      If a Limited Partner wishes and is permitted to Transfer its Units to any person in accordance with the terms of this Agreement, no such Transfer shall be made or shall be effective to make such Transferee a Partner or entitle such Transferee to any benefits or rights hereunder unless or until:

(i)       the Transferee shall have signed an agreement, in the form of Schedule A, to assume and be bound by all the obligations of the Transferor pursuant to this Agreement with respect to the Units Transferred arising from and after the date of such Transfer, and to be subject to all the restrictions to which the Transferor is subject under the terms of this Agreement;

(ii)      the Transferee shall have executed and acknowledged, if required, a certificate amending the Declaration or any other registration document of the Partnership in order to reflect such change, and shall have taken any other action that may be required in connection therewith;

(iii)     all required consents to such Transfer shall have been obtained in writing and delivered to the other Partners;

(iv)     the General Partner has no reason to believe that the Transfer is not being made in compliance with applicable securities laws or will subject the Partnership to additional regulation of any kind; and

(v)     the Transferee furnishes copies of all instruments effecting the Transfer and such other customary certificates, instruments and documents as the Partnership may reasonably require as necessary and appropriate to confirm the Transfer.

(b)     Any person who is a Transferee of Units pursuant to this Article 11 (other than a secured party with respect to any permitted Indebtedness) shall become a substitute Limited Partner (a "**Substitute Limited Partner**").  In the event of a Transfer of a Limited Partner's Units in the Partnership and the admission of a Transferee as a Substitute Limited Partner, all references herein to the Transferor shall be deemed to apply to such Substitute Limited Partner, and such Substitute Limited Partner shall succeed to all rights and obligations of the Transferor hereunder.  A person shall be deemed admitted to the Partnership as a Substitute Limited Partner at the time that the conditions in this Article 11 are satisfied and such person is listed as a Limited Partner in the Register.

(c)     For purposes of receiving distributions, a Transfer of Units made in accordance with this Article 11 shall be effective on the first day of the month following the day on which the requirements of this Article 11 have been satisfied, or at such earlier time as the General Partner reasonably determines. Distributions made after such effective date shall be made to the Substitute Limited Partner.

(d)     No Transfer of Units that is in violation of this Article 11 shall be valid or effective against, or shall bind, the Partnership, and neither the Partnership nor the Limited Partners shall recognize the same for the purpose of making allocations, distributions or other payments pursuant to this Agreement with respect to such Units. Neither the Partnership nor the non-transferring Limited Partners shall incur any liability as a result of refusing to make any such distributions to the Transferee of any such invalid Transfer, or any other person, and no such purported Transferee shall have any right to receive allocations or payments of any profits, losses or distributions of the Partnership.

(e)     If a Limited Partner Transfers, in accordance with this Agreement, all of its Units, the Transferring Limited Partner shall thereupon have no further obligations hereunder except as set forth in Section 11.4(a)(iv); provided, however, that such Transferor shall remain responsible for any and all of its debts and other liabilities under this Agreement arising prior to the time of such Transfer.

(f)     No Transfer of Units by a Limited Partner may be made if the Transfer would be prohibited or rendered nugatory by law (such as the *Investment Canada Act*) or any term of any agreement or document binding upon the Partnership in respect of the assets of the Partnership.

(g)     No Transfer of Units by a Limited Partner may be made pursuant to this Agreement if such Limited Partner has permitted an Encumbrance of its Units to be transferred otherwise than as permitted by this Agreement and if such Encumbrance has not been discharged.

(h)     No Limited Partner may grant an Encumbrance over its Units except as expressly permitted by this Agreement.

**ARTICLE 12**
**PERMITTED TRANSFERS**

**12.1**        **Consent**

A Limited Partner (other than BWF LP or its Affiliates) may at any time and from time to time Transfer all or any portion of its Units to any person with the prior written consent of the General Partner, on such terms and conditions as such consenting Partners shall approve in connection with such consent.

**12.2**        **Transfers to Affiliates**

A Principal Partner may at any time and from time to time Transfer all or any portion of its Units to a Permitted Transferee, without compliance with Section 12.4, provided that:

(a)        such Transferor establishes to the satisfaction of the other Partners, acting reasonably, that the person to which it is transferring its Units is an Affiliate of the Transferor;

(b)        unless the other Principal Partner shall otherwise agree, the Transferor and the Permitted Transferee shall agree in writing with the Partnership and the other Partners that they will remain Affiliates for so long as the Permitted Transferee is a Limited Partner and, if the Permitted Transferee ceases to be an Affiliate of the Transferor, the Permitted Transferee shall immediately Transfer the Units transferred to it by the Transferor hereunder along with any other Units of the Permitted Transferee to the Transferor;

(c)        the other Limited Partners shall have received prior written notice of such Transfer;

(d)        unless the General Partner shall otherwise reasonably agree, the Transferee is not a competitor of the Partnership, as determined in the reasonable discretion of the General Partner, and

(e)        all of the requirements for a Transfer set forth under Section 11.4 shall have been satisfied.

**12.3**        **Incapacity, Separation of Service or Other Specified Event**

(a)        In the event of the Incapacity, Separation from Service or Other Specified Event of or with respect to a Management Holder, the General Partner (or its designee) shall have the right, but not the obligation, within six months of the date of the occurrence of the event of the Incapacity, Separation from Service or Other Specified Event, to purchase all or any portion of the Units of such Management Holder at its Fair Market Value.  The General Partner shall provide notice of such Transfer specifying the effective date of such Transfer.  The closing of any such Transfer shall occur at such time and place and be subject to such conditions as the General Partner may determine.  The Management Holder shall pay all reasonable expenses, including attorneys' fees, incurred by the Partnership in connection with the Transfer of such Units.  To the extent not paid by the Management Holder, such expenses shall be borne by the purchaser of the Units.

(b)      In the event of the Incapacity, Separation from Service or Other Specified Event of or with respect to a Management Holder, the Partnership shall not be terminated, and the Management Holder's trustee in bankruptcy or other legal representative shall have only the rights of an assignee of the right to receive Partnership distributions applicable to the Units of such Management Holder as provided herein.  Any Transfer from such trustee in bankruptcy or legal representative shall be subject to the provisions of this Agreement.

(c)      Notwithstanding the foregoing, in the event of the Incapacity, Separation from Service or Other Specified Event of a Canadian Management Holder, the General Partner shall have the right, but not the obligation, to require the Transfer of all or any portion of the number of Units of the Canadian Management Holder that is equal to the Indirect Ownership Percentage of the applicable Canadian Management Holder.

**12.4      Tag-Along Rights**

(a)      Prior to any proposed Transfer pursuant to which BWF LP would, after such Transfer, own less than 50% of the then outstanding Units on a fully diluted basis (determined by equity value), BWF LP shall deliver a written notice (the "**Tag-Along Notice**") to the Partnership and the other Partners (the "**Tag-Along Partners**") specifying in reasonable detail the identity of the prospective Transferee and the terms and conditions of the Transfer.  The Tag-Along Partners may elect to participate in the contemplated Transfer by delivering written notice to BWF LP and the Partnership within five Business Days after delivery of the Tag-Along Notice.  If any Tag-Along Partner has elected to participate in such Transfer, such Tag-Along Partner shall be entitled to sell in the contemplated Transfer, at the same price and on the same terms, a pro rata number of Units to the Units being sold by BWF LP on a fully diluted basis.

(b)      BWF LP will use commercially reasonable efforts to obtain the agreement of the prospective Transferee to the participation of the Tag-Along Partners in any contemplated Transfer, and BWF LP will not be permitted to Transfer any of its Units to the prospective Transferee unless (i) the prospective Transferee agrees to allow the participation of the Tag Along Partners or (ii) BWF LP purchases the number of Units from the Tag-Along Partners that the Tag-Along Partners would have been entitled to and have provided a Tag-Along Notice to sell pursuant to this Section 12.4 for the consideration per Unit to be paid and otherwise on the same terms as the Units being purchased from BWF LP by the prospective Transferee.

(c)      Notwithstanding the foregoing, Units that have not vested or otherwise are not exercisable as of the date of the Tag-Along Notice are excluded from the Units eligible for participation rights pursuant to this Section 12.4, and the holders of such Units shall not be entitled to participate in any Transfers pursuant to this Section 12.4 with respect to such Units.

(d)      For greater certainty, BWF LP and its Affiliates may from time to time Transfer all or any portion of its Units, without compliance with this Section 12.4 but in compliance with Section 12.2, to the extent applicable, if BWF LP would, after such Transfer, own more than 50% of the then outstanding Units on a fully diluted basis (determined by equity value).

**12.5      Drag-Along Rights**

(a)      If BWF LP agrees to sell all of its Units to a single Third-Party Transferee (or group of related Transferees) and BWF LP (together with its Permitted Transferees) at the time of the sale, directly or indirectly holds an aggregate of more than 50% of the then total outstanding Units, then BWF LP shall have the right to require each of the other Limited

Partners to sell all of their respective Units (such sale, a "**Drag-Along Sale**") to such Third-Party Transferee. To exercise this right, BWF LP shall issue a notice to the other Limited Partners (the "**Drag-Along Notice**") stating that BWF LP proposes to effect the Drag-Along Sale, providing the terms of the Drag-Along Sale and advising the other Limited Partners of the obligation under this Section 12.5 to sell all of its or their respective Units to the relevant Third-Party Transferee and participate in the Drag-Along Sale contemplated by the Drag-Along Notice. Each other Limited Partner, upon receipt of a Drag-Along Notice, hereby agrees, and shall be obligated (and such obligation shall be enforceable by the Partnership and the other Partners), to (i) sell its Units and participate in the Drag-Along Sale contemplated by the Drag-Along Notice, (ii) enter into agreements of sale or merger agreements relating to the Drag-Along Sale and otherwise execute and deliver all agreements and instruments executed by BWF LP effectuating such Drag-Along Sale, and (iii) otherwise to take all actions necessary or desirable to cause the Partnership and the Partners to consummate the Drag-Along Sale; provided that nothing in this Section 12.5 shall require (x) YPF LP or any of its Affiliates to execute any non-competition or non-solicitation covenants, or (y) the Management Holders to execute and deliver a non-competition or non-solicitation for a period of more than two (2) years. The terms of any Drag-Along Sale, may be amended or modified from time to time, and any such Drag-Along Notice may be rescinded, upon the approval of the General Partner and BWF LP. The Partnership shall give prompt written notice of any such amendment, modification or rescission to all of the Partners.

(b)     Each Partner acknowledges and agrees that BWF LP shall have full and plenary power and authority, as the agent of the Partnership, to cause the Partnership to enter into a transaction providing for a Drag-Along Sale and to take any and all such further action in connection therewith as BWF LP may deem necessary or appropriate in order to consummate such Drag-Along Sale. BWF LP, in exercising its rights under this Section 12.5, shall, except as otherwise provided in Section 12.5(c), have complete discretion over the terms and conditions of any Drag-Along Sale effected hereby, including, without limitation, price, type of consideration, payment terms, conditions to closing, representations, warranties, affirmative covenants, negative covenants, indemnification, holdbacks and escrows.

(c)     The obligations of the Partners pursuant to this Section 12.5 are subject to the satisfaction of the following conditions:

(i)     subject to Section 12.5(c)(iii), each of the Partners shall receive the same proportion of the aggregate consideration from such Drag-Along Sale that such Partner would have received if such aggregate consideration had been distributed by the Partnership to the Partners in complete liquidation pursuant to the rights and preferences set forth in this Agreement as in effect immediately prior to the Drag-Along Sale;

(ii)    all Units shall be entitled to receive identical consideration on a pro-rata basis;

(iii)   if any Partner is given an option as to the form, amount or timing of consideration to be received, all Partners shall be given the same option;

(iv)    any expenses incurred for the benefit of the Partnership or all Partners, and any indemnities, holdbacks, escrows and similar items relating to the Drag-Along Sale, that are not paid or established by the Partnership (other than those that relate to representations or indemnities concerning

a Partner's valid ownership of its or their Units free and clear of all liens, claims and encumbrances or a Partner's authority, power and legal right to enter into and consummate a purchase or merger agreement or ancillary documentation) shall be paid or established by the Partners in proportion to the reduced amount of consideration each Partner would have received if the aggregate consideration from such Drag-Along Sale had been reduced by the aggregate amount of such expenses, indemnities, holdbacks, escrows or similar items; and

(v)     absent fraud, in no event shall any Partner have any liability other than several liability and any such liability shall be limited to the lesser of (i) the net consideration actually received by such Partner in the Drag-Along Sale, and (ii) such Partner's pro rata proportion of such liability on the basis of its proportionate holding of Units on a fully diluted basis.

**12.6     Pledge of Units**

(a)     In the event that a lender to the Partnership requires a Partner to pledge its Units or Interest as security for loans to the Partnership, such Partner shall be entitled to so pledge its Units or Interest. In the event that either BWF LP or YPF LP or any of their respective Affiliates requires financing to enable it to exercise its pre-emptive rights under Section 13.1, each of BWF LP or YPF LP or any of their respective Affiliates shall be entitled to pledge its respective Units as security for such financing.

(b)     The Units and the General Partner Interest shall be "securities" for purposes of the *Securities Transfer Act, 2006* (Ontario), similar legislation of other provinces and territories of Canada and Revised Article 8 of the *Uniform Commercial Code*, as such legislation may be in force and applicable from time to time.

**ARTICLE 13
PRE-EMPTIVE RIGHTS**

**13.1     Pre-Emptive Rights**

(a)     Any proposed issuance of Units to any person after the date hereof, or the issuance or granting of any rights, warrants or options to acquire Units by the Partnership (the "**Offered Securities**"), is subject to the provisions of this Section 13.1, except for issuances or grants:

(i)     in connection with an initial public offering of equity in the Partnership or any of its subsidiaries;

(ii)     between the Partnership and any subsidiary of the Partnership;

(iii)     under the Phantom Unit Plan or any other securities option, equity-based plan or other compensation agreement (excluding issuances or grants to any person who is both an employee of the Partnership or any subsidiary of the Partnership, on the one hand, and an employee of BWF LP or any of its Related Parties, on the other hand);

(iv)    to any employees, directors, managers, consultants or other service providers of the Partnership or any of its subsidiaries (excluding issuances or grants to any person who is both an employee of the Partnership or any subsidiary of the Partnership, on the one hand, and an employee of BWF LP or any of its Related Parties, on the other hand);

(v)    to pay all or a part of the purchase price in connection with any purchase of equity or assets by the Partnership or any of its subsidiaries approved by the General Partner;

(vi)    in connection with any security split, security dividend or recapitalization of the Partnership or any of its subsidiaries in which only holders of the same class of securities participate on a pro rata basis; or

(vii)    in connection with any strategic transaction to service providers and/or subcontractors if no securities are issued to BWF LP or any of its Related Parties.

(b)    The General Partner shall deliver an offering notice to the Limited Partners (the "**Offering Notice**") each time the Partnership decides to issue or grant Offered Securities. The Offering Notice shall specify (i) the total number of Offered Securities which are being offered, (ii) the rights, privileges, restrictions, terms and conditions of such Offered Securities, (iii) the consideration for which each of such Offered Securities is being offered, which consideration shall be the same for all of such Offered Securities of any class, (iv) the most current relevant financial information of the Partnership, and (v) the reasons for the issuance.

(c)    Each of the Limited Partners shall have the option, exercisable within 15 Business Days after receipt of an Offering Notice (the "**Option Period**"), by delivering a subscription notice to the General Partner in the form to be supplied by the General Partner (the "**Subscription Notice**") to subscribe for no more than its Pro Rata Percentage of the Offered Securities. In addition, the Limited Partners may subscribe for any additional Offered Securities for which the other Limited Partners do not subscribe, which right shall be exercised by a statement in the Subscription Notice setting forth the amount of Offered Securities such Limited Partner is prepared to irrevocably and unconditionally acquire expressed as a percentage of the additional Offered Securities, if any, available to be taken up by the Limited Partners.

(d)    Subject to Section 13.1(e), the Offered Securities will be allotted among those of the Limited Partners who have elected to subscribe for Offered Securities in accordance with the following:

(i)    each Limited Partner who has delivered a Subscription Notice will be allotted and will purchase its Pro Rata Percentage of the Offered Securities (or such lesser amount specified in the Subscription Notice of such Limited Partner, if applicable);

(ii)    if there are any Offered Securities remaining after the allotment specified in Section 13.1(d)(i), each Limited Partner who has delivered a Subscription Notice with respect to additional Offered Securities in excess of its Pro Rata Percentage of the Offered Securities shall purchase the lesser of (i) the number of additional Offered Securities in respect of which such Limited Partner has delivered a Subscription Notice, and (ii) a

Case 3:21-cv-00903   Document 1-2   Filed 12/03/21   Page 44 of 62 PageID #: 115

fraction of the Offered Securities remaining, the numerator of which is the number of additional Offered Securities in respect of which such Limited Partner has delivered a Subscription Notice and the denominator of which is the number of additional Offered Securities in respect of which all of the Limited Partners have delivered a Subscription Notice

(e)     If less than all of the Offered Securities are subscribed for, then the Partnership shall be entitled (i) to complete the remaining portion of the offering within 180 days from the date of the Offering Notice for such number of Offered Securities not subscribed for by Limited Partners pursuant to the Subscription Notices received by the Partnership with one or more third parties upon the same terms and conditions as the terms set out in the Offering Notice, or (ii) in the event that YPF LP or its Affiliates have not taken up its Pro Rata Percentage of such Offered Securities and the General Partner determines not to complete the offering, to give notice of cancellation of the offering to all Limited Partners.

(f)     The Partnership shall deliver a notice to each Limited Partner that delivered a Subscription Notice confirming the number of Offered Securities allocated to such holder and describing the total subscription price owed by such Limited Partner and the due date for such amount. Any Limited Partner who delivered a Subscription Notice shall, on or prior to the date funds are due, deliver to the Partnership a certified cheque, bank draft or wire transfer of immediately available funds in the amount of their subscription price.

(g)     If any Limited Partner fails to deliver a Subscription Notice for the Offered Securities in accordance with this Section 13.1 within the Option Period, then any rights which such Limited Partner may have had to subscribe for any of such Offered Securities shall be extinguished.

(h)     A Subscription Notice delivered by a Limited Partner shall, subject to this Section 13.1, constitute a binding agreement by such Limited Partner to subscribe for and take up, and by the Partnership to issue and sell to such Limited Partner, the number of Offered Securities subscribed for therein upon the terms and conditions specified in the Offering Notice.

**13.2     <u>Assignment of Pre-Emptive Rights</u>**

A Principal Partner may at any time and from time to time assign all or any portion of its rights under Section 13.1 to an Affiliate, provided that all of the requirements for a Transfer set forth under Section 12.2 shall have been satisfied, and upon such assignment such Principal Partner and Affiliate shall for the purposes of this Agreement act (through the Principal Partner only) as a single Limited Partner and shall benefit from and exercise all of their rights and obligations under this Agreement as one entity.  Without limiting the generality of the foregoing, the exercise of any right, the giving of any notice, the sending of any document to and the service of any procedure by or upon such Principal Partner shall be deemed to have been simultaneously exercised, sent to or served by or upon such Affiliate, and vice versa.

**ARTICLE 14**
**<u>EXCULPATION AND INDEMNIFICATION</u>**

**14.1     <u>Exculpation</u>**

(a)     No Covered Person shall be liable to the Partnership or any Partner for any costs, expenses, damages or liabilities incurred by reason of any action taken or omitted to be

taken by such Covered Person in good-faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or wilful misconduct by such Covered Person.

(b)     A Covered Person shall be fully protected in relying in good faith upon the records of the Partnership and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Income, Net Loss, costs, expenses, damages or liabilities of the Partnership or any facts pertinent to the existence and amount of assets from which distributions might properly be paid to the Partners) of the following persons or groups: (i) one or more legal or financial advisors, officers or employees of the Partnership or any of its subsidiaries; (ii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Partnership or any of its subsidiaries; or (iii) any other person selected in good faith by or on behalf of the Partnership, in each case as to matters that such Covered Person reasonably believes to be within such other person's professional or expert competence.

**14.2        <u>Liabilities and Duties of Covered Persons</u>**

This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Partners and the Partnership hereby waives any and all fiduciary duties that, absent such waiver, may be implied by applicable law, and in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to the Partners and the Partnership are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Partners to replace such other duties and liabilities of such Covered Person.

**14.3        <u>Indemnification</u>**

(a)     To the fullest extent permitted by the Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Partnership to provide broader indemnification rights than the Act permitted the Partnership to provide prior to such amendment, substitution or replacement), the Partnership shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all costs, expenses, damages or liabilities to which such Covered Person may become subject by reason of or in any way related to or arising out of this Agreement, the Partnership or the management or administration of the Partnership or in connection with the business or affairs of the Partnership or the activities of such Covered Person on behalf of the Partnership; provided, that a Covered Person shall not be entitled to indemnification hereunder (i) with respect to any claims as between such Covered Person and the Partnership, or (ii) to the extent such costs, expenses, damages or liabilities are finally determined by a court of competent jurisdiction to have arisen out of gross negligence or willful misconduct of such Covered Person.

(b)     The satisfaction of any indemnification obligation pursuant to Section 14.3(a) and the advancement of expenses pursuant to Section 14.3(c) shall be from and limited to the assets of the Partnership (including insurance) and no Partner (unless such Partner otherwise agrees in writing), in such capacity, shall be subject to personal liability on account thereof or shall be required to make additional Capital Contributions or return any distributions to help satisfy such indemnity by the Partnership.

(c)     The Partnership shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any costs, expenses, damages or liabilities for which such Covered Person may be indemnified pursuant to this Section 14.3; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 14.3, then such Covered Person shall promptly reimburse the Partnership for any reimbursed or advanced expenses.

(d)     The indemnification provided by this Section 14.3 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 14.3 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 14.3 and shall enure to the benefit of the successors or heirs, executors, administrators and other legal personal representatives, and permitted assigns of such Covered Person.

(e)     The Partnership may purchase, at its expense, insurance to cover costs, expenses, damages or liabilities covered by the foregoing indemnification provisions and to otherwise cover costs, expenses, damages or liabilities for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the General Partner may determine; provided, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified hereunder. If any Covered Person recovers any amounts in respect of any costs, expenses, damages or liabilities from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Partnership for any amounts previously paid to such Covered Person by the Partnership.

## ARTICLE 15
## RESTRICTIVE COVENANTS

**15.1**     **Non-Solicitation**

(a)     So long as any Partner (other than the Principal Partners and their Affiliates) owns any Units (each such Partner other than the Principal Partners and their Affiliates, a "**Restricted Partner**") and for one year after such person ceases to own Units (the "**Restricted Period**"), the Restricted Partner agrees that the Restricted Partner shall not, and shall not permit any of the Restricted Partner's Affiliates to, in any manner, directly, indirectly, individually, in partnership, jointly or in conjunction with any person, (i) hire, recruit or solicit or attempt to hire, recruit or solicit, on any of their behalves or on behalf of any other person, any employee or former employee of the Partnership or any of its subsidiaries, (ii) encourage any person to hire, recruit or solicit any employee or former employee of the Partnership or any of its subsidiaries, or (iii) otherwise encourage any employee of the Partnership or any of its subsidiaries to discontinue his or her employment by the Partnership or its subsidiaries; provided that nothing in this Section 15.1(a) shall prevent the Restricted Partner or any of its Affiliates from taking any of the foregoing actions, including soliciting, recruiting, hiring or engaging, with respect to any former employee of any of the Covered Persons who has not been employed by or otherwise provided services to any of the Covered Persons for the 365 day period immediately preceding the date of employment or engagement of such person by the Restricted Partner or any of its

Affiliates; and provided, further, that general solicitation not directed specifically at employees of any of the Covered Persons, without the employment of a person who responds to such a general advertisement shall not be deemed to violate this Section 15.1(a).

(b)     During the Restricted Period, the Restricted Partner shall not, and shall not permit any of Restricted Partner's Affiliates to, in any manner, directly, indirectly, individually, in partnership, jointly or in conjunction with any person, (i) solicit or entice, or attempt to solicit or entice, any clients, customers, suppliers or subcontractors of any of the Covered Persons for the purpose of diverting its business or services from any of the Covered Persons or (ii) persuade, or attempt to persuade, any clients, customers, suppliers or subcontractors of any of the Covered Persons to terminate or adversely modify such client's, customer's, supplier's or subcontractor's relationship with any of the Covered Persons. For the purposes of this 15.1(b), clients, customers, suppliers or subcontractors of the Partnership or any of its subsidiaries shall include any and all clients, customers, suppliers or subcontractors of the Partnership or any of its subsidiaries (i) as of the date hereof or at any time during the two years prior to the date hereof or (ii) over the course of the Restricted Period (irrespective of whether such client, customer, supplier or subcontractor is a client, customer, supplier or subcontractor of the Partnership or any of its subsidiaries as of the date hereof).

## 15.2     **Non-Disparagement**

Each Partner shall not, and shall not permit any of such Partner's Affiliates to, knowingly engage in any conduct that involves the making or publishing of written or oral statements or remarks which are disparaging, deleterious or damaging to the integrity, reputation or good will of the Partnership or any of its subsidiaries or their respective management, officers, directors, managers, employees or consultants; provided that nothing in this subsection 15.2 shall prevent truthful testimony in any legal proceeding.

## 15.3     **Confidentiality**

Each Partner agrees that during the period of this Agreement and following the termination of this Agreement, except as required by applicable law, it shall use Confidential Information (as defined below) only for the purposes of fulfilling its obligations hereunder, and shall not directly or indirectly disclose, divulge, reveal, report, publish, transfer or use any Confidential Information for any other purpose whatsoever; provided that this shall not prevent a Partner from disclosing Confidential Information to its advisors, accountants, attorneys, to *bona fide* potential Transferees of the Partner's Interests and to *bona fide* potential investors in a Partner who enter into a confidentiality agreement in customary form, provided that in any such case the person to whom Confidential Information is disclosed is advised of the proprietary nature of the Confidential Information and the restrictions contained in this Section 15.3 and the disclosing Partner shall be responsible for any breach of this Section 15.3 by such person. For purposes of this Agreement, the term "**Confidential Information**" shall mean all confidential information concerning the Partnership, the Partners and their Affiliates and their respective businesses, in whatever form or manner provided, whether or not reduced to writing, whether tangible or intangible, including (a) financial statements and other financial and operating information, (b) processes, methods, techniques and arrangements relating to such businesses and activities and the manner in which the Partnership and its Affiliates do business, (c) mailing lists, (d) the identity of any Partner, such Partner's Interest, investor or prospective investor in the Partnership or any purchaser or prospective purchaser of any Units of the Partnership, (e) any other materials or information that is not generally known to others engaged in similar businesses or activities, and (f) all information that contains, is derived from or relates to any of

the above enumerated materials and information; provided, however, Confidential Information shall not include information which: (i) is or becomes generally available other than as a result of a disclosure by a Partner in violation of this Section 15.3, (ii) becomes available to such Partner on a non-confidential basis from a person not otherwise bound by a confidentiality undertaking towards the Partnership or the General Partner, or (iii) is required to be disclosed pursuant to applicable law,.

**ARTICLE 16**
**MISCELLANEOUS**

**16.1** **Notices**

(a) Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be delivered in person, transmitted by fax or e-mail or similar means of recorded electronic communication or sent by registered mail, charges prepaid, addressed as follows:

(i) to the Partnership, the General Partner or Employeeco:

c/o Blue Wolf Capital Partners
One Liberty Plaza, 52nd Floor
New York, NY 10006

Attention: Chief Compliance Officer
Fax No.: (917) 677-8233
E mail: jcs@bluewolfcapital.com

in each case, with a copy to BWF LP;

(ii) to the Limited Partners as follows:

(A) in the case of BWF LP

c/o Blue Wolf Capital Partners
One Liberty Plaza, 52nd Floor
New York, NY 10006

Attention: Chief Compliance Officer
Fax No.: (917) 677-8233
E mail: jcs@bluewolfcapital.com

(B) in the case of YPF LP

c/o 152928 Canada Inc.
199 Bay Street,
Toronto, ON M5L 1B9

Attention: Tyler Smyrski
Email: tsmyrski@ypoint.ca

(C)     in the case of any of the other Limited Partners, to such Limited Partner's address, facsimile number, or email address set forth in the Register

(b)     Any such notice or other communication shall be deemed to have been given and received on the day on which it was delivered or transmitted (or, if such day is not a Business Day or if delivery or transmission is made on a Business Day after 5:00 p.m. at the place of receipt, then on the next following Business Day) or, if mailed, on the third Business Day following the date of mailing; provided, however, that if at the time of mailing or within three Business Days thereafter there is or occurs a labour dispute or other event which might reasonably be expected to disrupt the delivery of documents by mail, any notice or other communication hereunder shall be delivered or transmitted by means of recorded electronic communication as aforesaid.

(c)     Any party may at any time change its address for service from time to time by giving notice to the other parties in accordance with this Section 16.1.

## 16.2     Amendments and Waivers

Any amendment or waiver of any provision of this Agreement shall require the Approval of the General Partner and the approval of the Limited Partners holding in the aggregate over 50% of the outstanding Units, provided that no such amendment or waiver that disproportionately and/or materially adversely affects the rights of any Principal Partner or its Affiliates may be made without the approval of the Principal Partner that is disproportionately and/or materially adversely affected (with any change to any special approval rights of such Principal Partner or its Affiliates deemed to have a material adverse effect). No waiver of any provision of this Agreement shall constitute a waiver of any other provision, nor shall any waiver of any provision of this Agreement constitute a continuing waiver unless otherwise expressly provided.

## 16.3     Status Reports

Each Partner agrees that, upon the written request of another Partner from time to time, it shall furnish promptly to the requesting Partner a written statement on the status of any matter pertaining to this Agreement to the best of the knowledge and belief of the Partner making such statement. If in any given calendar year a Partner requests another Partner to provide such written statement on more than three occasions, then the requesting Partner shall reimburse such other Partner for its reasonable costs of providing any additional written statements during such calendar year.

## 16.4     Successors and Assigns

This Agreement shall enure to the benefit of and shall be binding on and enforceable by and against the parties and their respective successors or heirs, executors, administrators and other legal personal representatives, and permitted assigns.

## 16.5     Further Assurances

Each of the parties hereto shall, from time to time hereafter and upon any reasonable request of any of the other parties, do, execute, deliver or cause to be done,

Case 3:21-cv-00903   Document 1-2   Filed 12/03/21   Page 50 of 62 PageID #: 121

executed and delivered all further acts, documents and things as may be required or necessary for the purposes of giving effect to this Agreement.

**16.6**        **<u>Claims</u>**

       Each of the Partners will notify the other Partner of any claim, demand, right or cause of action asserted, threatened or instituted against it which involves the Partnership or the performance of this Agreement.

**16.7**        **<u>Disputes</u>**

       (a)       If any dispute, claim, question or difference arises out of or in relation to this Agreement or any breach thereof (a "**Dispute**"), prior to initiating any legal action or other legal proceeding, a Partner shall appoint a designated representative for it whose task it will be to meet for the purpose of endeavoring to resolve any such Dispute, which designated representative shall contact any other applicable party to such Dispute. Each other applicable party shall thereafter also appoint a designated representative. If such party is an individual, it shall be the designated representative. If such party is not an individual, its designated representative shall be a senior level manager of such party or other person with the authority to make decisions and/or commitments on behalf of the respective party to resolve the Dispute. The designated representatives shall in good faith seek to resolve the Dispute without the necessity of any formal proceeding. Unless delay would impair a party's rights under applicable statutes of limitations, formal proceedings for the resolution of a Dispute may not be commenced until the earlier of: (A) the designated representatives concluding in good faith that amicable resolution through continued negotiation of the matter does not appear likely; or (B) the expiration of the 15 day period immediately following the initial request to negotiate the Dispute.

       (b)       If a Dispute cannot be resolved or settled by the Partners in accordance with Section 16.7(a), prior to initiating any legal action or other legal proceeding, the Dispute shall first be referred to non-administered mediation before a single mediator pursuant to the National Mediation Rules of the ADR Institute of Canada, Inc. (the "**ADR Institute**") then in effect. The Partners shall agree upon an acceptable independent and impartial mediator within ten (10) days of any Partner notifying the other Partners of its desire to mediate the Dispute. If the Partners are unable to agree upon a mediator within 10 days, any Partner may request such appointment by the ADR Institute. In the event the Partners are required to seek the assistance of the ADR Institute to appoint a mediator, the mediation shall proceed thereafter as an administered mediation under the auspices of the ADR Institute. The Partners covenant and agree to select a mediator in the City of Toronto who is qualified by education and/or training to mediate the particular Dispute. The mediation shall be conducted in the City of Toronto. Participation in the mediation shall not adversely affect any right or legal remedy the parties hereto may otherwise have. Either party to the mediation shall have the right to terminate such mediation at any time 20 days after such mediation commences.

       (c)       Nothing in this Section 16.7 shall limit the right of any Partner to pursue other legal action in respect of any Dispute in respect of which the mediation process described in Section 16.7(b) has been exhausted.

**16.8**        <u>**Counterparts**</u>

This Agreement and all documents contemplated by or delivered under or in connection with this Agreement may be executed and delivered in any number of counterparts, with the same effect as if all parties had signed and delivered the same document, and all counterparts shall be construed together to be an original and will constitute one and the same agreement.

**[Signature page follows.]**

IN WITNESS WHEREOF this Agreement has been executed by the parties as of the date first above written.

THE STATE GROUP HOLDINGS GP LLC

By: _____
    Name: Michael Ranson
    Title:   President

**BW CAYMAN AIV IV GP LLC**, in its capacity as general partner of **BW CAYMAN AIV IV GP LP**, in its capacity as general partner of **BW CAYMAN AIV IV, L.P.**

By: _____
    Name: Adam Blumenthal
    Title:   Manager

**YP BUILDERS LIMITED PARTNERSHIP**, by its general partner, **YELLOW SG GP CORP.**

By: _____
    Name:
    Title:

**THE STATE GROUP MANAGERS LLC**

By: _____
    Name: Bennet Grill
    Title:   Secretary

SIGNED, SEALED & DELIVERED
in the presence of:

_____
          Witness

_____
          Luke Jones

*Signature Page to State Group Holdings Partners LP Limited Partnership Agreement*

IN WITNESS WHEREOF this Agreement has been executed by the parties as of the date first above written.

**THE STATE GROUP HOLDINGS GP LLC**

By: _____
     Name: Michael Ranson
     Title:   President

**BW CAYMAN AIV IV GP LLC**, in its capacity as general partner of **BW CAYMAN AIV IV GP LP**, in its capacity as general partner of **BW CAYMAN AIV IV, L.P.**

By: _____
     Name: Adam Blumenthal
     Title:   Manager

**YP BUILDERS LIMITED PARTNERSHIP**, by its general partner, **YELLOW SG GP CORP.**

By: _____
     Name:
     Title:

**THE STATE GROUP MANAGERS LLC**

By: _____
     Name: Bennet Grill
     Title:   Secretary

SIGNED, SEALED & DELIVERED
in the presence of:

_____
Witness

_____
Luke Jones

*Signature Page to State Group Holdings Partners LP Limited Partnership Agreement*

IN WITNESS WHEREOF this Agreement has been executed by the parties as of the date first above written.

THE STATE GROUP HOLDINGS GP LLC

By: _____
     Name: Michael Ranson
     Title:   President

BW CAYMAN AIV IV GP LLC, in its capacity as general partner of BW CAYMAN AIV IV GP LP, in its capacity as general partner of BW CAYMAN AIV IV, L.P.

By: _____
     Name: Adam Blumenthal
     Title:   Manager

YP BUILDERS LIMITED PARTNERSHIP, by its general partner, YELLOW SG GP CORP.

By: _____
     Name: _Tyler Smyrski_
     Title: _Director._

THE STATE GROUP MANAGERS LLC

By: _____
     Name: Bennet Grill
     Title:   Secretary

SIGNED, SEALED & DELIVERED
in the presence of:

_____       _____
       Witness                       Luke Jones

*Signature Page to State Group Holdings Partners LP Limited Partnership Agreement*

IN WITNESS WHEREOF this Agreement has been executed by the parties as of the date first above written.

THE STATE GROUP HOLDINGS GP. LLC

By: _____
Name: Michael Ranson
Title:   President

**BW CAYMAN AIV IV GP LLC**, in its capacity as general partner of **BW CAYMAN AIV IV GP LP**, in its capacity as general partner of **BW CAYMAN AIV IV, L.P.**

By: _____
Name: Adam Blumenthal
Title:   Manager

**YP BUILDERS LIMITED PARTNERSHIP**, by its general partner, **YELLOW SG  GP CORP.**

By: _____
Name:
Title:

**THE STATE GROUP MANAGERS LLC**

By: _____
Name:  Bennet Grill
Title:   Secretary

SIGNED, SEALED & DELIVERED
in the presence of:

_____         _____
                Witness                                                   Luke Jones

*Signature Page to State Group Holdings Partners LP Limited Partnership Agreement*

IN WITNESS WHEREOF this Agreement has been executed by the parties as of the date first above written.

**THE STATE GROUP HOLDINGS GP LLC**

By: _____
   Name: Michael Ranson
   Title:   President

**BW CAYMAN AIV IV GP LLC**, in its capacity as general partner of **BW CAYMAN AIV IV GP LP**, in its capacity as general partner of **BW CAYMAN AIV IV, L.P.**

By: _____
   Name: Adam Blumenthal
   Title:   Manager

**YP BUILDERS LIMITED PARTNERSHIP**, by its general partner, **YELLOW SG GP CORP.**

By: _____
   Name:
   Title:

**THE STATE GROUP MANAGERS LLC**

By: _____
   Name: Bennet Grill
   Title:   Secretary

SIGNED, SEALED & DELIVERED
in the presence of:

_____
Witness

_____ Luke Jones

*Signature Page to State Group Holdings Partners LP Limited Partnership Agreement*

SIGNED, SEALED & DELIVERED
in the presence of:

_____
Witness

_____
Tim Koivisto

SIGNED, SEALED & DELIVERED
in the presence of:

_____
Witness

_____
Steve Weber

SIGNED, SEALED & DELIVERED
in the presence of:

_____
Witness

_____
John Schauerman

**STEVE THEODORU**, in his capacity as trustee of **THE STEVE THEODORU LIVING TRUST**

By: _____
    Name: Steve Theodoru
    Title:   Trustee

*Signature Page to State Group Holdings Partners LP Limited Partnership Agreement*

SIGNED, SEALED & DELIVERED
in the presence of:

_____          _____
Witness                                                      Tim Koivisto

SIGNED, SEALED & DELIVERED
in the presence of:

_____          _____
Witness                                                      Steve Weber

SIGNED, SEALED & DELIVERED
in the presence of:

_____          _____
Witness                                                      John Schauerman

**STEVE THEODORU**, in his capacity as
trustee of **THE STEVE THEODORU
LIVING TRUST**

By: _____
      Name:  Steve Theodoru
      Title:    Trustee

*Signature Page to State Group Holdings Partners LP Limited Partnership Agreement*

SIGNED, SEALED & DELIVERED
in the presence of:

_____
Witness

_____
Tim Koivisto

SIGNED, SEALED & DELIVERED
in the presence of:

_____
Witness

_____
Steve Weber

SIGNED, SEALED & DELIVERED
in the presence of:

_____
Witness

_____
John Schauerman

**STEVE THEODORU**, in his capacity as
trustee of **THE STEVE THEODORU
LIVING TRUST**

By: _____
       Name:  Steve Theodoru
       Title:    Trustee

*Signature Page to State Group Holdings Partners LP Limited Partnership Agreement*

SIGNED, SEALED & DELIVERED
in the presence of:

_____
Witness

_____
Tim Koivisto

SIGNED, SEALED & DELIVERED
in the presence of:

_____
Witness

_____
Steve Weber

SIGNED, SEALED & DELIVERED
in the presence of:

_____
Witness

_____
John Schauerman

**STEVE THEODORU**, in his capacity as trustee of **THE STEVE THEODORU LIVING TRUST**

By: _____
Name: Steve Theodoru
Title:   Trustee

**SCHEDULE A**

**FORM OF ASSUMPTION AGREEMENT**
**(SECTION 11.4(A)(I))**

Re:     Amended and Restated Limited Partnership Agreement dated April 3, 2018 between, *inter alios*,  **[Insert Partners]**. governing the affairs of **[The State Group Holdings Partners LP]** (the "**Partnership Agreement**")

The undersigned (the "Transferee"), the proposed transferee of the Interest presently owned by **[insert name of transferor]** (the "Transferor"), for good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by the Transferee), hereby covenants with **[insert name of the other Partners]** and their successors and permitted assigns to observe, perform and be bound by, from and after the date the sale of such Interest to the Transferee is completed, all the covenants and obligations of the Transferor under the Partnership Agreement, and to be subject to all the restrictions to which the Transferor is subject under the terms of the Partnership Agreement. All capitalized terms used herein shall have the same meaning as in the Partnership Agreement, except as otherwise expressly provided herein.

**IN WITNESS WHEREOF** the undersigned has duly executed this agreement.

**DATED** this            day of                   ,     .

**[NAME OF PROPOSED TRANSFEREE]**

by _____

Name:

Title: